Harry ZYCH, doing business as American Diving and Salvage Company, Plaintiff–Appellee,

v.

WRECKED VESSEL BELIEVED TO BE THE "LADY ELGIN," her engines, boilers, machinery, tackle, apparel, and cargo, located within five miles of a point at coordinates 42 degrees, 11 minutes north latitude, 87 degrees, 39 minutes west longitude, Defendant,

and

The Lady Elgin Foundation, Inc., Claimant–Appellee,

and

United States of America, Intervening Defendant,

and

Illinois Historic Preservation Agency and Illinois Department of Transportation, Intervening Defendants–Appellants.

No. 91–1673.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 24, 1992.

Decided April 3, 1992.

Paul N. Keller (argued), Park Ridge, Ill., Lenore E. McQuilling, Walker & Corsa, New York City, for plaintiff-appellee.

Peter E. Hess, Wilmington, Del., for defendant.

Linda A. Wawzenski, Asst. U.S. Atty., Office of the U.S. Atty., Criminal Div., Chicago, Ill., Barbara B. O'Malley, Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., for intervening defendant.

Rosalyn B. Kaplan, Asst. Atty. Gen., Richard Linden, Office of the Atty. Gen., Jennifer A. Keller, Asst. Atty. Gen., Office of the Atty. Gen., Civ. Appeals Div., James R. Carroll, William K. Kane, Roland W. Burris, Office of the Atty. Gen., Chicago, Ill., for intervening defendants-appellants.

Before CUMMINGS, EASTERBROOK, and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

Harry Zych, a diver, has been searching for wrecks in Lake Michigan. Recently he located two sidewheel steamers: the *Seabird,* which went down in 1868, and the *Lady Elgin,* which met its end in 1860. Zych commenced *in rem* salvage actions under the law of admiralty. Our case presents a question reserved in *Zych v. The Seabird,* 941 F.2d 525, 534 & nn. 15, 16 (7th Cir.1991): Whether the eleventh amendment prevents the district court from declaring that a finder has rights superior to those of a state claiming an interest in a wreck.

I

One of the largest vessels at the time on the Great Lakes, the 300–foot, 1000–ton *Lady Elgin* (Figure 1) was built in Buffalo in 1851. In 1860 the *Lady Elgin,* under the command of Captain John Wilson, carried passengers, mail, livestock, and freight between Chicago and Bayfield, Wisconsin, and points along the way. One hundred members of the Union Guards in Milwaukee's Irish, Democratic, "Bloody Third" Ward hired the *Lady Elgin* for passage the evening of September 6, 1860, taking their wives, children, and friends to Chicago for the rally the next day for Stephen Douglas, running for President against Abraham Lincoln. See William Ratigan, *Great*

*Lakes Shipwrecks and Survivals* 43–49 (1977 rev.); Dwight F. Clark, *The Wreck of the Lady Elgin*, J. Ill. St. Historical Soc. 407–18 (Dec. 1946); A.T. Andreas Co., 2 *History of Chicago* 74–76 (1885).

. After the rally a German band and 50 extra passengers joined the Irish Democrats and crew for the return voyage. While the band played and the merrymakers danced, a thunderstorm came up. About 2:00 a.m., while the *Lady Elgin* was running with full lights off Waukegan, the 350–ton schooner *Augusta* (Figure 2) rammed her amidships without warning. Although the unlighted *Augusta* had the *Lady Elgin* in her sights for some 20 minutes, she made no effort to change course until shortly before the collision. After disengaging, the *Augusta* resumed course for Chicago. Within 30 minutes the *Lady Elgin* broke up and sank about 10 miles off shore. Three life boats got off, and almost 300 persons clung to the hurricane deck of the *Lady Elgin*, which the force of the waves tore away from the ship.

Only 96 of the 393 souls on board the *Lady Elgin* survived, more than 100 dying within yards of shore at dawn as the surf shattered their supports and an undertow pulled them back into the lake. Captain Wilson and 25 passengers on one of the five segments remaining from the hurricane deck arrived at a sand bar under the 40–foot bluffs at Winnetka. The captain drowned trying to rescue a woman washed away from the platform. He received a hero's burial. Captain D.M. Malott of the *Augusta*, by contrast, was condemned for negligent sailing and leaving another vessel in distress. So strong was public sentiment that in May 1861 the *Augusta* (renamed the *Colonel Cook* in an unsuccessful attempt at disguise) abandoned her cargo in Milwaukee to avoid being burned by a mob and fled the Great Lakes. A few years later Malott and the crew of the *Augusta* met their fate on the bark *Major*, which vanished with all hands in Lake Michigan.

This second-greatest tragedy in the history of the Great Lakes was celebrated in song and story. Henry C. Work, who wrote the song "Lost on the *Lady Elgin*," went on to greater fame with his "Marching Through Georgia." So many Irish political activists died on September 8, 1860, that the disaster has been credited with transferring the balance of political power in Milwaukee from the Irish to the Germans. Aetna Insurance Company paid $11,993.20 and became the owner of the wreck. Aetna had written policies of $5,000 on the hull and $2,500 on the cargo. (Its files do not reveal why it paid more.) The insurer instructed its agents not to abandon the *Lady Elgin*, but nothing other than flotsam was found for 129 years, until Zych located the wreck in deep water.

Zych sought a judgment confirming his title "against all claimants and all the world." In case that were not comprehensive enough, he demanded that "all governments, governmental agencies, [and] states" be required to show cause why he should not "be put into full possession and [his] title confirmed." The only two governments with a potential interest in the vessel are the United States and Illinois. Both intervened, the state through two agencies that serve as its alter egos and to which we refer, collectively, as "Illinois." The wreck lies under the navigable waters of the United States within Illinois, and thus on "lands beneath navigable waters" for purposes of the Submerged Lands Act, 43 U.S.C. § 1301(a)(1). Whatever interest the United States has in the debris, it surrendered to Illinois via § 3 of the Submerged Lands Act, 43 U.S.C. § 1311, and the Abandoned Shipwreck Act of 1987, 43 U.S.C. §§ 2101–06. After first asserting title to all abandoned shipwrecks "embedded in submerged lands of a State", § 2105(a)(1), Congress transferred ownership "to the State in or on whose submerged lands the shipwreck is located", § 2105(c). Illinois believes that it owns the *Lady Elgin* under this statute as well as three state laws.

After intervening, Illinois asked the district court to dismiss Zych's action, or at a minimum exclude the state from the scope of any judgment, on the ground that the eleventh amendment prevents the court from adjudicating any dispute between

Zych and Illinois. (We use "eleventh amendment" as shorthand for the Constitution in conjunction with the principles of sovereign immunity that the Supreme Court applies to suits against states.) Zych challenged both the application and the constitutionality of the state and federal laws, but the district court granted the state's motion in part. 746 F.Supp. 1334 (N.D.Ill. 1990). Relying on *Florida Department of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982), the court concluded that once a state demonstrates a "colorable claim" to the wreck, the eleventh amendment insulates it from adjudication of adverse claims. Although the court dismissed the suit to the extent Zych sought relief against Illinois, it concluded that the eleventh amendment does not bar an adjudication of Zych's rights vis-à-vis other persons.

Zych had a problem: To show entitlement to salvage or ownership under the law of finds, he needed to show that the *Lady Elgin* is an abandoned wreck. If it is, then Zych prevails over all other private claimants but the state may take the prize. If the *Lady Elgin* is an abandoned wreck, then the eleventh amendment may prevent litigation against Illinois in federal court, and if he moves to state court Illinois has a powerful claim on the merits, subject to the requirement that it show that the wreck is "embedded", see § 2105(a)(1) and *The Seabird*, 941 F.2d at 529–30. If, however, the wreck is not abandoned, then other private persons may have claims superior to Zych's. To hedge his bets, Zych decided to acquire any existing private interests in the *Lady Elgin*. He and some friends formed the Lady Elgin Foundation, Inc., to approach CIGNA, Aetna's successor. The Foundation purchased CIGNA's rights in the vessel in exchange for 20% of the gross proceeds of the sale of any items recovered from the wreckage. Intervening, the Foundation asserted a claim superior to Zych's.

Once the district court dismissed Zych's claims against Illinois, there followed litigation between Zych and the Foundation having at most the trappings of adversariness. Zych contended that the *Lady Elgin* is an abandoned shipwreck, and the Foundation contended that it is not. The district court ruled for the Foundation, concluding that Aetna, which instructed its agents not to abandon the *Lady Elgin*, never intentionally surrendered its interest as subrogee of the vessel's owner. 755 F.Supp. 213 (1991).

This turn of events disturbed Illinois, whose strongest claim depends on the *Lady Elgin*'s being an "abandoned" vessel. Nonetheless, it refused to participate in the "contest" between Zych and the Foundation, standing on its view that the eleventh amendment precludes the entry of a judgment adverse to a state and that at all events it had been dismissed from the proceedings. According to the district judge, Illinois' standoffishness waived all right to be heard on the merits of the question whether the *Lady Elgin* is indeed abandoned. 755 F.Supp. at 217. Given its conclusion that the Foundation owns the wreck, the court held that the eleventh amendment no longer barred a judgment in Zych's favor. Zych signed a salvage contract with the Foundation, promising to turn over half of all he retrieved. As holder of salvage rights granted by the owner of the *Lady Elgin*, Zych applied for an injunction barring all potential rivals, including Illinois, from interfering with his efforts to raise artifacts from the wreckage. The district court issued the requested injunction, 1991 WL 34714, 1991 U.S. Dist. LEXIS 2962, from which Illinois appeals.

## II

Illinois urges three objections to the district court's conclusion: First, the state contends that having concluded that the state's claim is colorable so that the state was at no risk, the court could not adjudicate the merits in its absence and use the result as the basis of an injunction. Second, Illinois insists that its claim is not only colorable but also correct. Third, Illinois maintains that the strength of a state's legal arguments has nothing to do with its immunity under the eleventh amendment. Because the eleventh amendment limits the

jurisdiction of the federal courts, we start with this third argument.

▮▮▮ The eleventh amendment applies to admiralty *in rem* proceedings. *In re New York (I)*, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921); *In re New York (II)*, 256 U.S. 503, 41 S.Ct. 592, 65 L.Ed. 1063 (1921). A judgment declaring that the state possesses no interest in particular property is a judgment "against one of the United States" for constitutional purposes. Cf. *Dugan v. Rank*, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *Land v. Dollar*, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947).

▮ According to Zych, everything changed with *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), which Zych presents as holding that prospective relief never violates the eleventh amendment. A declaration of rights in the wreck governs future conduct exclusively and therefore does not transgress the eleventh amendment. Zych misunderstands *Edelman*, which reaches no such sweeping conclusion. See *Green v. Mansour*, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). *Edelman* discussed the scope of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which permits relief against public officials under circumstances establishing that the officials are not "the state". *Edelman* holds that courts may command public officials to obey the Constitution and federal statutes as they carry out their duties in the future but may not direct them to invade the state treasury to make good for past misdeeds. Such relief, which would effectively bind the state, is forbidden even if nominally against private persons. *Edelman* and *Young* are irrelevant when the state appears in its own name. Then we know that the party is "one of the United States" to which the eleventh amendment applies. *Cory v. White*, 457 U.S. 85, 90–91, 102 S.Ct. 2325, 2329, 72 L.Ed.2d 694 (1982); *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Paschal v. Jackson*, 936 F.2d 940 (7th Cir.1991). The Illinois Historic Preservation Agency and the Illinois Department of Transportation, the two intervening agencies, *are* the State of Illinois for constitutional purposes. *Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Kaimowitz v. Board of Trustees*, 951 F.2d 765, 767–68 (7th Cir.1991). It is therefore no surprise that the Supreme Court recently declared, without citing *Edelman*, that there is no general *in rem* exception to principles of sovereign immunity. *United States v. Nordic Village, Inc.*, —— U.S. ——, 112 S.Ct. 1011, 1017, 117 L.Ed.2d 181 (1992).

The district judge located her "colorable claim" requirement not in *Edelman* but in *Treasure Salvors*. Yet *Treasure Salvors* is nothing but an application of *Edelman*. A diver located the *Nuestra Señora de Atocha*, a 17th century Spanish galleon, in water more than three miles from Florida's coast. After the court of appeals held, in litigation between the finder and the United States, that the wreck lay in international waters, *Treasure Salvors, Inc. v. The Atocha*, 569 F.2d 330 (5th Cir.1978), the district court issued process to arrest some of the galleon's artifacts in Florida's possession. The warrant directed the marshal to seize the artifacts from two named public officials; the state itself intervened. Whether the warrant could be executed presented the usual question under *Young*: were these two natural persons to be treated as "one of the United States"? Four justices said no, 458 U.S. at 693–99, 102 S.Ct. at 3318–22 (Stevens, J., joined by Burger, C.J., and Marshall & Blackmun, JJ.); four said yes, *id.* at 702–17, 102 S.Ct. at 3323–31 (White, J., joined by Powell, Rehnquist & O'Connor, JJ.); one denied that the answer mattered, *id.* at 700–02, 102 S.Ct. at 3322–24 (Brennan, J., adhering to his view that *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), was wrongly decided, and that neither the eleventh amendment nor principles of sovereign immunity curtails the jurisdiction of the federal courts when the plaintiff is a citizen of the defendant state).

The four justices who thought that *Edelman* and *Young* authorized the warrant stressed that Florida had not commanded the two officials to maintain possession of the artifacts, which came into the state's possession under a contract with the salvor—a contract that by its terms expired when the court of appeals held that the *Atocha* lay outside the state's waters. Justice Stevens observed that "the State does not have even a colorable claim to the artifacts" under its contract, 458 U.S. at 694, 102 S.Ct. at 3319, and that no statute "has been advanced that even arguably would authorize officials of the Division of Archives to retain the property at issue", *id.* at 696, 102 S.Ct. at 3320, in the absence of a contract. Because Florida had not commanded the officials to retain the artifacts, these four justices believed, the warrant was not equivalent to an order overriding the state's decision. These four justices went on to hold, however, that the district judge erred in adjudicating the rights of the state itself. *Id.* at 699–700, 102 S.Ct. at 3322. The four justices who thought *Edelman* and *Young* insufficient to authorize the warrant necessarily concluded that the court could not resolve the claims of the state. So eight justices were of opinion that a district court may not, in an admiralty *in rem* action, decide whether a state owns a wreck and its artifacts.

*Treasure Salvors* did not overrule *New York (I)* and *New York (II)*, which preclude an injunction of the kind the district court issued. Although *Treasure Salvors* shows that some members of the Court believe that it is appropriate to grant relief affecting public officials who hold salvaged artifacts under feeble legal claims, it creates no opening for relief against a state in its own name. The strength of the state's legal position is irrelevant; the eleventh amendment prevents the district judge from exercising jurisdiction. Accord, *Maritime Underwater Surveys, Inc. v. Abandoned Sailing Vessel (The Whidah)*, 717 F.2d 6, 8 (1st Cir.1983); *Fitzgerald v. Abandoned Vessel (HMS Defiance)*, 866 F.2d 16, 18 (1st Cir.1989).

To know whether a general all-the-world injunction runs against a state, the court must determine whether the state has *some* interest. Michigan has no conceivable interest in the remains of the *Lady Elgin*, so an all-claimants injunction could not be thought to invade Michigan's privileges in violation of the eleventh amendment. In this sense, some view of the merits is inevitable. *Marx v. Guam*, 866 F.2d 294, 299–300 (9th Cir.1989), on which Zych relies, establishes no more than this. We hold that it is the existence, and not the strength, of the claim that activates the eleventh amendment. No one doubts that Illinois has a claim, which is the principal target of the district judge's injunction. To the extent *Sindia Expedition, Inc. v. The Sindia*, 895 F.2d 116, 119–20 (3d Cir.1990), holds that an *in rem* action is *never* against the state, the court misunderstands *Treasure Salvors*, and we respectfully disagree with its holding.

### III

One final subject detains us only briefly. Illinois contends that the state is an indispensable party under Fed.R.Civ.P. 19(b). If it is, the district court must dismiss the entire case. The first circuit agrees with this position, see *The Whidah*, 717 F.2d at 8; *HMS Defiance*, 866 F.2d at 18–19. The third circuit does not, see *The Sindia*, 895 F.2d at 121–23. *The Seabird* settles the question for our circuit, pointing out, 941 F.2d at 534 n. 16, that *Treasure Salvors* itself allowed a court to issue a decree without the presence of the state as a formal party. The district court accordingly may determine the rights of Zych versus the world with the exception of Illinois. The showdown between Zych and Illinois will occur in state rather than federal court.

VACATED AND REMANDED

Figure 1
(Courtesy of Evanston Historical Society)

Figure 2
(Courtesy of Evanston Historical Society)