**FAIRPORT INTERNATIONAL EXPLORATION, INC.,**
Plaintiff–Appellant,

v.

The **SHIPWRECKED VESSEL KNOWN AS THE CAPTAIN LAWRENCE,** in rem, Defendant–Appellee,

**The State of Michigan, Intervenor–Appellee.**

No. 95–1783.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 15, 1996.

Jan. 30, 1997.

Rehearing Denied March 7, 1997.

Donald C. Adams, Jr. and Ralph F. Mitchell (argued and briefed), Rendigs, Fry, Kiely & Dennis, Cincinnati, OH, for Plaintiff–Appellant.

Stephen F. Schuesler (argued and briefed), Office of the Attorney General, Natural Resources Division, Lansing, MI, for Intervenor–Appellee.

Richard T. Robol, Columbus America Discovery Group, Columbus, OH, for Amicus Curiae.

Before: JONES, RYAN, and MOORE, Circuit Judges.

RYAN, Circuit Judge.

The plaintiff, Fairport International Exploration, Inc., filed an *in rem* admiralty action seeking salvage rights against *The Captain Lawrence,* a vessel that sank in Lake Michigan in 1933. The State of Michigan intervened under, *inter alia,* the Abandoned Shipwreck Act of 1987 (the ASA), 43 U.S.C.

§§ 2101–2106, and filed a motion to dismiss. Fairport appeals from the district court's grant of that motion, arguing that the district court erred in concluding that *The Captain Lawrence* had been abandoned. For the reasons that follow, we will affirm.

## I.

*The Captain Lawrence,* rebuilt from a yacht originally constructed in 1898, first sank in Lake Michigan in 1931. It was towed into the shallow water of a Milwaukee, Wisconsin, river and sold for $150 to Wilfred H. Behrens. Behrens apparently did what needed to be done to make *The Captain Lawrence* seaworthy, and the ship departed Milwaukee for Summer Island, Michigan, in August 1933, with Behrens as captain and a crew of four.

According to a Record of Casualties to Vessels filed by Behrens in November 1933, *The Captain Lawrence* became stranded near Poverty Island, Michigan, on September 19, 1933, and then sank after a "terrific wind came up" and blew the vessel onto some rocks. *The Captain Lawrence* was contacted by the Coast Guard the next morning, but declined offers of assistance. In the Record of Casualties, Behrens declared the estimated value of the total loss to be $200, and reported that the vessel was carrying no cargo. Testimony in the district court regarding the value of vessels during the 1930s indicated that comparable vessels, when new, would have sold for $14,500.

In arguing on appeal that Behrens and his descendants did not "abandon" *The Captain Lawrence* after this incident, Fairport's brief claims that

> Wilfred Behrens, owner and master of the *Captain Lawrence,* evidenced the desire and intention to salvage the vessel, building a cabin on Poverty Island and staying there for some time in the hope of salvaging the vessel ... but, because of the loss of the ship and his equipment and strained financial circumstances, was unable to do so.

The transcript page cited by Fairport fails to support this version of events, as it simply recounts the following:

> There was an account that after the *Captain Lawrence* was wrecked they stayed in a log cabin, and we went and found one and there was portions of the wreckage that they had used the door off the *Captain Lawrence* that they hauled ashore, a door, a roof on this log cabin, and they stayed there till they could get sufficient help to get off the island.

To the extent this testimony suggests anything about Behrens's motive for staying in a log cabin, it suggests that he did so simply as a temporary means of finding shelter after the ship went down; it certainly does *not* suggest that the crew "stay[ed] there for some time in the hope of salvaging the vessel," and if anything, it contradicts that assertion. Further, we find nothing in our independent consideration of the record that could support Fairport's claim that Behrens "evidenced the desire and intention to salvage the vessel."

Steven Libert, the president of plaintiff Fairport, has a self-proclaimed obsession with "the legend of a Civil War era gold treasure allegedly lost in northern Lake Michigan in the vicinity of Poverty Island." His research on the subject led him to conclude that *The Captain Lawrence* had been searching for the legendary treasure at the time of the shipwreck, and he hypothesized that the ship was "an important key" to locating the gold. As a result, Libert has been diving intermittently in the Poverty Island vicinity since 1983. He has found two items that he believes belong to *The Captain Lawrence:* an anchor and a propeller blade.

Fairport asserts title to the wreck of *The Captain Lawrence* based on its execution of a Salvage Bill of Sale with Gladys Nally, a surviving heir of Behrens who, in turn, is the assignee of the interests of all the other surviving heirs. Fairport filed this *in rem* admiralty action in June 1994, seeking to perfect its title to and salvage rights in the wreck.

▪ The State of Michigan intervened and moved to dismiss in August 1994, arguing that the wreck belonged to Michigan under the ASA. Under the ASA, the federal government asserts title to certain historic

wrecks, and then transfers that title to the state on whose submerged lands the wrecks are found. 43 U.S.C. § 2105. A shipwreck meets the requirements of the ASA if it is (1) abandoned; (2) located on the state's submerged lands; and (3) either embedded in the sea floor or eligible for listing in the National Register of Historic Places. Michigan argued that the wreck met the requirements of the ASA, and that the district court accordingly lacked subject-matter jurisdiction over Fairport's claim; that is, the suit was in reality against the State of Michigan and thus barred by the Eleventh Amendment.

Although initially noting its "very serious reservations as to whether Plaintiff has in fact found any evidence of the *Captain Lawrence*," the district court assumed for purposes of its analysis that the "evidence [was] sufficient to identify the *res.*" Concluding that the second and third prongs of an ASA claim were satisfied because the vessel asserted to be *The Captain Lawrence* was embedded in the sea floor of Michigan's submerged lands, the district court then reasoned that "in order to show that the ASA applies, the State has the burden of showing by a preponderance of the evidence that the vessel was abandoned." Such proof would give rise to the conclusion that Michigan had a "colorable claim" within the meaning of the ASA, thus divesting the district court of jurisdiction. The court concluded that *The Captain Lawrence* had in fact been abandoned:

> The *Captain Lawrence* is a relatively recent wreck. It did not sink in deep water. It was stranded on Poverty Island. Assuming the evidence Plaintiff has found is from the *Captain Lawrence,* the vessel is in pieces close to shore in only 40–60 feet of water. It was not technologically unfeasible to locate or to salvage the *Captain Lawrence* in the 1930's. Modern technology was not essential to the recover of the vessel.
>
> The evidence, although circumstantial, clearly demonstrates Wilfred Behrens' intent to abandon the vessel. He valued the vessel at only $200, had no insurance on it, and wrote it off as a "total loss." Had he

wanted to salvage the vessel, the best time would have been immediately after it was stranded on the beach. Yet there is no evidence that he attempted any salvage operations immediately after the wreck. The evidence shows that Behrens was offered assistance from the Coast Guard immediately after the storm, but declined it. The evidence shows that Behrens was an experienced salvager, and continued his salvage diving for over ten years after the shipwreck. Yet there is no evidence that he ever attempted to salvage the *Captain Lawrence* in the years after the wreck.

> Behrens did not discuss the location of the *Captain Lawrence* with his family. He died intestate. He did not leave his interest in the vessel to his family or to anyone else. There is no evidence that his crew showed any interest in returning to the *Captain Lawrence.* Behrens' family did not seek out salvage divers to help locate the remains of the *Captain Lawrence.* They showed no interest in finding the *Captain Lawrence* until Libert told them of the possibility of a link between the *Captain Lawrence* and the legendary gold treasure.

Based on these facts, the court concluded that Michigan had "met its burden of showing by a preponderance of the evidence that the *Captain Lawrence* was abandoned by Wilfred Behrens."

From the judgment of dismissal, Fairport filed this timely appeal.

## II.

In considering a motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed.R.Civ.P. Rule 12(b)(1), the district court may look beyond the jurisdictional allegations in the complaint and consider whatever evidence is submitted. *See Moir v. Greater Cleveland Reg'l Transit Auth.,* 895 F.2d 266, 269 (6th Cir.1990). We then consider *de novo* the district court's legal conclusion that it lacked subject-matter jurisdiction. *See United States v. Moncini,* 882 F.2d 401, 403 (9th Cir.1989). Likewise, the question of whether Eleventh Amendment immunity applies is a question of law, the determination of which we review *de novo.* *See*

*Williams v. Commonwealth of Kentucky,* 24 F.3d 1526, 1543 (6th Cir.1994). Whether a vessel has been abandoned, however, is a question of fact, to be reviewed for clear error only. *See Deep Sea Research, Inc. v. The Brother Jonathan,* 89 F.3d 680, 684, 688 (9th Cir.1996).

### III.

#### A.

The ASA provides that "States have the responsibility for management of a broad range of living and nonliving resources in State waters and submerged lands," including "certain abandoned shipwrecks, which have been deserted and to which the owner has relinquished ownership rights with no retention." 43 U.S.C. § 2101(a) & (b). To implement these congressional findings, the statute provides that the "United States asserts title to any abandoned shipwreck that is ... embedded in submerged lands of a State," as well as to certain other categories of shipwrecks not implicated here. 43 U.S.C. § 2105(a). The ASA then provides for a transfer of title from the United States to the individual state "in or on whose submerged lands the shipwreck is located." 43 U.S.C. § 2105(c). Finally, the statute provides, "[t]he law of salvage and the law of finds shall not apply to abandoned shipwrecks to which section 2105 of this title applies," 43 U.S.C. § 2106(a), although "the laws of the United States relating to shipwrecks" shall continue to apply in cases involving wrecks that do not meet the requirements of the ASA, 43 U.S.C. § 2106(b).

#### B.

■ The foregoing provisions of the ASA have been interpreted as divesting federal courts of admiralty jurisdiction over claims to embedded shipwrecks, and concurrently vesting state courts with jurisdiction over such claims, contrary to the general provisions of Article III that "[t]he judicial Power shall extend ... to all Cases of admiralty and maritime Jurisdiction." U.S. CONST. art. III, § 2, cl. 1; *see Zych v. Unidentified, Wrecked and Abandoned Vessel, Believed to be The Seabird,* 941 F.2d 525, 533 (7th Cir.

1991) ("*Seabird I* "). This divestiture is analytically accomplished through the application of the Eleventh Amendment, as it is well-settled that when the Eleventh Amendment applies to bar suit against a state, federal courts are divested of subject-matter jurisdiction. *Estate of Ritter v. University of Michigan,* 851 F.2d 846, 848 (6th Cir.1988).

■ Fairport first argues that the Eleventh Amendment does not bar its suit because the primary purpose of the Eleventh Amendment is to avoid having monetary judgments rendered against states, and its suit does not seek a monetary judgment against Michigan. We may readily dispose of this argument.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Amendment presupposes "first, that each State is a sovereign entity in our federal system; and second, that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *Seminole Tribe of Florida v. Florida,* —— U.S. ——, ——, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996) (internal quotation marks, brackets, and citations omitted). The Amendment embodies two distinct purposes:

> Adoption of the Amendment responded most immediately to the States' fears that "federal courts would force them to pay their Revolutionary War debts, leading to their financial ruin." More pervasively, current Eleventh Amendment jurisprudence emphasizes the integrity retained by each State in our federal system[.]

*Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, ——, 115 S.Ct. 394, 400, 130 L.Ed.2d 245 (1994) (citations and footnote omitted).

"[T]he Court has held that the Amendment bars suits in admiralty against the States, even though such suits are not, strictly speaking, 'suits in law or equity.'" *Welch v. Texas Dep't of Highways & Pub. Transp.,* 483 U.S. 468, 472–73, 107 S.Ct. 2941, 2945, 97 L.Ed.2d 389 (1987) (citing, *inter alia, Ex*

*parte New York, No. 2,* 256 U.S. 503, 41 S.Ct. 592, 65 L.Ed. 1063 (1921)). As the *Welch* Court observed, "to permit a creditor to seize and sell a government-owned vessel . . . would be to permit him in some degree to destroy the government itself." *Id.* at 489, 107 S.Ct. at 2954 (internal quotation marks, brackets, and citations omitted). Thus, "[a] judgment declaring that the state possesses no interest in particular property is a judgment 'against one of the United States' for constitutional purposes." *Zych ' v. Wrecked Vessel Believed to be The "Lady Elgin",* 960 F.2d 665, 669 (7th Cir.1992) (*"Lady Elgin "*).

Finally, we note that the majority of those few intermediate courts of appeals that have had occasion to apply the ASA have held that the Eleventh Amendment bars a suit such as this when a state has a claim pursuant to the ASA. *See Zych v. Unidentified, Wrecked, and Abandoned Vessel, Believed to be The Seabird,* 19 F.3d 1136, 1141 (7th Cir.1994) (*"Seabird II "*); *Lady Elgin,* 960 F.2d at 669. *But see Sindia Expedition, Inc. v. Wrecked and Abandoned Vessel, Known as "The Sindia",* 895 F.2d 116, 119–20 (3d Cir.1990). We now join them, finding Fairport's initial argument to be without merit.

### C.

Accepting, then, that the Eleventh Amendment applies to divest the federal court of subject-matter jurisdiction over this case so long as the terms of the ASA are satisfied, the question becomes whether its terms are satisfied. In that regard, the sole question before us is whether *The Captain Lawrence* was "abandoned" within the meaning of the statute. That question, in turn, has two components: one, the substantive meaning of the term, and two, the proper burden of proof.

Fairport's arguments focus on the preliminary question. Fairport contends that the district court erred in determining that the vessel was abandoned because abandonment cannot be shown in the absence of strong and convincing evidence, such as an owner's express declaration of abandonment, and because the circumstantial evidence relied on was weak. Michigan, in turn, argues that the district court applied the incorrect burden of proof. The district court, it asserts,

should have engaged only in a cursory review of the merits to determine if Michigan's claim was colorable, because it is the existence of its claim, not its strength, that is significant. It contends that because it owns the lands beneath its territorial water, and because the ASA transfers to states title to abandoned shipwrecks embedded in state-owned lands, it necessarily has stated a "colorable claim."

### 1.

■ ·We will address the latter argument first. The State of California, in *Brother Jonathan,* argued, just as Michigan does here, "that it need not demonstrate by a preponderance of the evidence ·that the wreck of the *Brother Jonathan* meets the requirements of the ASA in order to make a colorable claim of ownership and qualify for Eleventh Amendment immunity." *Brother Jonathan,* 89 F.3d at 684. California basically took the position that it simply needed to "assert" that the vessel was on its submerged lands, and that it held title to abandoned shipwrecks on those lands. *Id.* at 685. The state contended that the Eleventh Amendment "limits the showing required to make a colorable claim to ownership of an abandoned shipwreck." *Id.* Otherwise, it reasoned, if it had actually to prove the merits of its claim, then it would effectively be robbed of immunity. *Id.* at 685–86. The court rejected this argument:

> [A] federal court has both the power and duty to determine whether a case falls within its subject matter jurisdiction. Therefore, it was appropriate for the district court to require the State to present evidence that the ASA applied to the *Brother Jonathan, i.e.,* that it was abandoned and either embedded or eligible for listing in the National Register, before dismissing the case. *Otherwise, as DSR points out, the State could receive immunity simply by asserting that it was entitled to it. For a federal court to renounce jurisdiction over an admiralty case on the basis of a mere assertion of entitlement to immunity on the part of the State is ·inconsistent with the court's duty to assess whether it has jurisdiction.*

*Id.* at 686 (emphasis added) (citations omitted). The court also reasoned that "'Eleventh Amendment immunity ... should be treated as an affirmative defense,' which 'must be proved by the party that asserts it and would benefit from its acceptance.'" *Id.* at 687 (citation omitted). In closing, the court noted that

> in addressing the questions of abandonment, embeddedness, and historical significance of the wreck under the ASA, a federal court does not adjudicate the state's rights. The ASA does not vest title to wrecks that satisfy its requirements directly in the state. Rather, it provides that the *federal* government may assert title to such wrecks. Only after the federal government takes title to the abandoned shipwreck may title then be transferred to the state. Thus, a federal court may adjudicate the question of whether a wreck meets the requirements of the ASA without implicating the Eleventh Amendment. Therefore, we hold that the district court did not err in requiring the State to prove by a preponderance of the evidence that it was entitled to Eleventh Amendment immunity.

*Id.* at 687–88 (citations omitted).

We agree with the reasoning of *Brother Jonathan,* and find Michigan's argument, essentially that it should not have had to prove abandonment at all, unpersuasive. *Brother Jonathan* provides an excellent analysis of why it is appropriate to require a state to prove the claimed lack of subject-matter jurisdiction; indeed, any other rule would tie the hands of the federal court, and turn over jurisdictional determinations to the parties. Michigan points to no case in any other context where a court has simply accepted a state's assertion of Eleventh Amendment immunity, nor does it provide any rationale for why the admiralty context should yield a unique Eleventh Amendment jurisprudence.

### 2.

We turn now to Fairport's argument that the district court clearly erred in finding that *The Captain Lawrence* had been abandoned. The ASA itself does not define the term "abandoned," but two recent cases articulate the conflicting views on what is required to make an adequate showing. The first is *Brother Jonathan,* itself, decided after the district court decision in this case, but supporting its reasoning. A very different definition of "abandoned" is found in *Columbus–America Discovery Group v. Atlantic Mut. Ins. Co.,* 974 F.2d 450 (4th Cir.1992).

The *Brother Jonathan* court approved the following test for abandonment:

> Traditionally, maritime law has found abandonment when title to a vessel has been affirmatively renounced, *or when circumstances give rise to an inference that the vessel has been abandoned;* courts have found abandonment, for instance, when a vessel is "so long lost that time can be presumed to have eroded any realistic claim of original title."
>
> . . . .
>
> ... [The district court's] holding that the *Brother Jonathan* is not abandoned rests on the traditional rule that a wreck is not abandoned unless either 1) title is affirmatively renounced *or* 2) abandonment can be inferred from the lapse of time or failure to pursue salvage efforts on the part of the owners.

89 F.3d at 688 (emphasis added) (citation omitted). This reasoning accords with the vast majority of decisions that have discussed the issue. *See, e.g., United States v. Steinmetz,* 973 F.2d 212, 222–23 (3d Cir.1992).

The opposing view is expressed in *Columbus–America.* The first important fact to note about *Columbus–America,* however, is that it is not an ASA case. Rather, the court engaged in a lengthy discussion of the law of salvage and the law of finds, and their conflicting policies. The law of salvage is aimed at preserving title in the original owner, allowing a salvor a right to possession and an award, but not the title itself. Application of the law of finds, however, can result in the actual transfer of title to the salvor. Thomas J. Schoenbaum, 2 ADMIRALTY & MARITIME LAW § 16–7 (2d ed.1994). Abandonment can occur in either context, but because of the differing results, different standards for determining abandonment are imposed. In any event, the *Columbus–America* court's inter-

pretation of these doctrines led it to reason as follows:

> Today, finds law is applied to previously owned sunken property only when that property has been abandoned by its previous owners. Abandonment in this sense means much more than merely leaving the property, for it has long been the law that "[w]hen articles are lost at sea the title of the owner in them remains." Once an article has been lost at sea, "lapse of time and nonuser are not sufficient, in and of themselves, to constitute an abandonment." In addition, there is no abandonment when one discovers sunken property and then, even after extensive efforts, is unable to locate its owner.

> While abandonment has been simply described as "the act of deserting property without hope of recovery or intention of returning to it," in the lost property at sea context, there is also a strong *actus* element required to prove the necessary intent. "Abandonment is said to be a voluntary act which must be proved by a clear and unmistakable affirmative act to indicate a purpose to repudiate ownership." The proof that need be shown must be "strong . . ., such as the owner's express declaration abandoning title."

*Columbus–America*, 974 F.2d at 461 (citations omitted). The court acknowledged, however, that "'[i]n the treasure salvage cases, often involving wrecks hundreds of years old, the inference of abandonment may arise from lapse of time and nonuse of the property, or there may even be an express disclaimer of ownership.'" *Id.* at 462 (citation omitted).

This court will follow the lead of *Brother Jonathan* rather than that of *Columbus–America*. The approach of *Columbus–America* is premised entirely on its policy choices involving the law of salvage and the law of finds, neither of which applies under the ASA. The only question under the ASA is whether a ship has been abandoned so as to give the state a claim. Common sense makes readily apparent that the statute did not contemplate a court's requiring express abandonment; such explicit action is obviously rare indeed, and application of such a rule would render the ASA a virtual nullity.

We find it unnecessary to undertake an analysis of whether the *Columbus–America* court correctly interpreted the laws of salvage and finds and their varying approaches to abandonment; we simply note that there is ample authority that abandonment may, for some purposes at least, be inferred from the surrounding circumstances. And here, there is no question that the district court's finding of abandonment was not clearly erroneous, as there was an abundance of circumstantial evidence justifying an inference of abandonment. In fact, apart from its argument that there must be a showing of express abandonment, the only support Fairport offers for its position is its completely unsubstantiated claims about Behrens's salvage attempts. In short, Fairport has not shown that the district court's conclusion was clearly erroneous.

## IV.

The district court's judgment is **AFFIRMED**.