## In the
# United States Court of Appeals
## For the Seventh Circuit

No. 12-2702

MCDONOUGH ASSOCIATES, INC.,

*Plaintiff-Appellee,*

*v.*

BILL GRUNLOH and ANN L. SCHNEIDER,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:12-cv-05035—**Milton I. Shadur**, *Judge.*

ARGUED NOVEMBER 13, 2012—DECIDED JULY 16, 2013

Before CUDAHY, SYKES, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This case presents an attempt by a state contractor, plaintiff McDonough Associates, Inc., to pursue what amounts to a breach of contract claim against the State of Illinois in federal court. Threatened with bankruptcy and collapse if it did not receive payments it contends were due from the state, McDonough presented the district court with a creative

theory for relief under the Due Process Clause of the Fourteenth Amendment. Facing these exigencies, the district court entered a temporary restraining order (TRO) that effectively ordered state officials to pay McDonough from the state treasury to compensate for alleged breaches of contract. While McDonough has cloaked its claim in the language of federal due process, its suit remains in substance an effort to have a federal court order state officials to make payments from the state treasury to remedy past alleged breaches of contract. Such relief is prohibited by the Eleventh Amendment. We reject McDonough's attempt to side-step the Eleventh Amendment, and we vacate the district court's TRO.

I. *Factual and Procedural Background*

Plaintiff McDonough Associates, Inc. is an architecture and engineering firm that frequently bid on and won contracts for design jobs for the Illinois Department of Transportation, commonly known as IDOT. IDOT regularly contracts with private firms like McDonough. To appreciate the relief the district court ordered, we need to provide some background information regarding IDOT's practices for negotiating supplemental terms when the scope of an original contract is not large enough to complete the needed work.

When that happens, IDOT negotiates terms with the contractor for the remaining work. IDOT then sends the contractor a "prior approval" letter. The prior approval letter reflects this negotiation and asks the contractor to

draft a supplemental agreement package for IDOT's consideration. The prior approval letter authorizes the contractor to continue working until it has accrued $50,000 in additional costs. The letter explains that, up to the $50,000, "[a]ll costs accrued under this authorization will be included in, and this letter of authorization superseded by, the supplemental agreement." The prior approval letter makes clear that it is not a contractual agreement that supplements the old contract. It states explicitly (in bold and underlined text) that until the supplemental agreement "is fully executed," the firm "may **not** invoice for any of this additional work until the required supplemental agreement between the Department and your firm is fully executed." The state thus disclaims liability absent a signed supplemental agreement for work beyond the $50,000 stopgap authorization.

The Illinois Procurement Code governs the state's contractual relationships and imposes certain requirements that must be met for a contract with the state to be fully executed. The Code provides that "The State shall be under no obligation to issue an award or execute a contract," and "No person shall have any right to a specific contract with the State unless that person has a contract that has been signed by an officer or employer of the purchasing agency with appropriate signature authority." 30 ILCS 500/1-25. Illinois statutes include specific provisions for contracts over $250,000, one of which is the requirement that certain individuals sign a contract before it is considered validly executed. Under Illinois law, the agency's chief executive officer must sign the contract and the chief legal counsel and

chief fiscal officer must either sign the contract or otherwise approve the contract in writing. 30 ILCS 105/9.02(a)(1). Within IDOT, internal policy also requires that the chief procurement officer signs the contract.

Absent these signatures, under Illinois state law a contract of the type in dispute here is not valid and therefore not an enforceable debt. 30 ILCS 500/20-80(d). IDOT's chief executive officer is defendant Ann Schneider and IDOT's chief procurement officer is defendant Bill Grunloh. Thus, for a supplemental agreement to have been fully executed and contractually binding on the state under Illinois law, it must have had Grunloh's and Schneider's signatures. Their decisions not to sign the supplemental agreements in question form the basis of McDonough's federal due process claim.

McDonough claims that IDOT owed it nearly $2 million accrued from additional work beyond the limits of the original contracts in three separate projects. In each of these projects, a prior approval letter had been sent to and received by McDonough between June and October 2011. In none of these projects had a supplemental agreement been fully executed, yet McDonough continued working on the contracts beyond the $50,000 caps.

In January 2012, based on findings that McDonough had made significant accounting errors that called its business integrity into question, chief procurement officer Grunloh, pursuant to his power under 44 Ill. Admin. Code § 6.530, suspended (on an interim basis) McDonough's status as a "prequalified vendor" automatically eligible to bid on IDOT projects. In June 2012, follow-

ing an investigation, hearing, and recommendation by a neutral decision-maker, as required by 44 Ill. Admin. Code § 6.630, Grunloh converted the interim suspension to a three year suspension.

In other words, in the interim after prior approval letters had been sent but before supplemental agreements had been executed, McDonough's status with IDOT changed considerably. Its billing practices had been questioned and were ultimately adjudicated as lacking integrity and being untrustworthy. Informed by the same findings that resulted in McDonough's suspension, IDOT's Grunloh and Schneider declined to approve or sign any further contractual agreements with McDonough, including the three supplemental agreements in question. The supplemental agreements were therefore not legally binding on IDOT because they lacked Schneider's signature, required by Illinois law.

McDonough claims that it continued working on the three projects beyond the $50,000 caps without executing supplemental agreements because it was IDOT's normal business practice always to sign a supplemental agreement once a prior approval letter had been sent. McDonough claims that the supplemental agreement is something of a bureaucratic formality.[1] Based on this

---

[1] The transmission and receipt of these prior approval letters and their contents saying that contractors may not invoice for work prior to the execution of a supplemental agreement are all undisputed. The parties dispute, however, IDOT's customary business practices. McDonough argues that the

(continued...)

understanding, McDonough alleged, Grunloh's and Schneider's refusal to sign the supplemental agreements deprived it of its property interests in payment on the accrued debts without receiving federally guaranteed due process of law.[2]

McDonough argued to the district court that the defendants' refusal to release the funds it claimed it had earned would render it bankrupt, resulting in immediate

---

(...continued)

text of the prior approval letters is contrary to IDOT's customary practice. McDonough claims that the $50,000 figure in the prior approval letters is a "universally used plug-in dollar amount" that "has no relation to the amount agreed upon between IDOT and its consultants." Furthermore, McDonough argues that it is "IDOT's practice, not only to allow, but to require, consultants [such as McDonough Associates, Inc.] continue to work on projects after the $50,000 stated plug-in amount has been exhausted." Without conceding the point, IDOT argues that whatever its customary practice might be, it is not relevant here because McDonough's suspension took the parties' business relationship well outside the normal course of business. We need not resolve this factual dispute, which does not affect the controlling constitutional question.

[2] McDonough's original complaint sued Grunloh and Schneider in both their individual and official capacities and included additional claims related to McDonough's suspension from IDOT's pre-approved contractor list after an audit revealed questionable business practices. Prior to this appeal of the TRO, McDonough voluntarily dismissed all claims without prejudice except the due process claim against Grunloh and Schneider in their official capacities. We thus do not consider or discuss the dismissed claims.

layoffs and corporate collapse. McDonough requested and the district court granted a TRO that compelled Grunloh and Schneider to sign the supplemental agreements, ordering them to "cease and desist from interfering with the processing of any paperwork in the normal course of business related to monies claimed by McDonough Associates, Inc." The district court appreciated that the relief it fashioned via the TRO compelled state officials to execute contracts with private parties, necessarily resulting in payment to private parties. The court explained that "what is going to happen is that your — Mr. Grunloh is going to take his hot little hand and a pen in hand or whatever has to be done . . . and he is going to sign the thing that is necessary for the processing in the orderly course." As a result of that TRO, the supplemental agreements were fully executed and binding under Illinois state contract law and thus IDOT disbursed nearly $1.3 million to McDonough before we stayed the TRO on an emergency basis.

While defendants were complying with the TRO, they also moved the district court to dissolve or decline to extend the TRO, arguing that it was essentially a "contract claim for money damages against the State of Illinois, and the Eleventh Amendment forbids retrospective awards of damages directly against the State Treasury." The district court denied defendants' request, concluding that the relief granted fell under the *Ex parte Young*, 209 U.S. 123 (1908), exception to state sovereign immunity. Defendants next requested that we issue an emergency stay of the TRO pending appeal, which we granted though, as noted, $1.3 million had already

been paid. We now consider the appeal on a non-emergent basis.

II.  *Analysis*

Under 28 U.S.C. § 1331, the district court had jurisdiction to consider McDonough's complaint alleging violations of federal due process rights. We have jurisdiction under 28 U.S.C.§ 1292(a) to review the TRO and the district court's determination that the Eleventh Amendment did not bar the TRO. Moreover, district court decisions rejecting state claims of sovereign immunity under the Eleventh Amendment are immediately reviewable under 28 U.S.C. § 1291 as final decisions pursuant to the collateral order doctrine. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993); *Goshtasby v. Bd. of Trustees of Univ. of Illinois*, 123 F.3d 427, 427-29 (7th Cir. 1997). When considering the appeal of a TRO, we review the district court's legal conclusions *de novo*, its findings of fact for clear error, and its balance of the equities for abuse of discretion. *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 841 (7th Cir. 2012). The denial of state sovereign immunity is a legal conclusion that we therefore review *de novo*. *Burrus v. State Lottery Comm'n of Indiana*, 546 F.3d 417, 419 (7th Cir. 2008); *Richman v. Sheahan*, 270 F.3d 430, 434 (7th Cir. 2001).[3]

---

[3] After oral argument, McDonough was put into Chapter 7 bankruptcy proceedings, but that does not prevent our decision in this appeal. The automatic stay under 11 U.S.C.

(continued...)

A.  *Mootness*

The TRO in question expired on August 8, 2012. The expiration of the TRO, however, has not mooted the appeal. Compliance with injunctions "does not moot an appeal if it remains possible to undo the effects of compliance or if the order will have a continuing impact on future action." 13B Wright & Miller, *Federal Practice & Procedure, Jurisdiction & Related Matters*, § 3533.2.2 (3d ed. 2012). "Mootness is particularly inapposite if an ill-conceived injunction creates a standoff by compelling conduct that is prohibited by other law." *Id.* See also *Dale M. ex rel. Alice M. v. Bd. of Educ. of Bradley Bourbonnais High Sch. Dist. No. 307*, 237 F.3d 813, 815 (7th Cir. 2001) ("A judgment creditor who pays the judgment pending appeal instead of posting a supersedeas bond . . . is entitled to the return of its money if the decision is reversed, and

---

[3]  (...continued)

§ 362(a)(1) for judicial proceedings against the debtor does not apply to suits brought by the debtor. *Martin-Trigona v. Champion Federal Savings and Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989). The fact that plaintiff McDonough is now the appellee does not matter. Whether a suit is "against the debtor" depends on the party's status at the time the initial action was filed. *Cathey v. Johns-Manville Sales Corp.*, 711 F.2d 60, 61-62 (6th Cir. 1983); *Ass'n of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 449 (3d Cir. 1982); *In re Mid-City Parking, Inc.*, 332 B.R. 798, 807 (Bankr. N. D. Ill. 2005) (collecting cases). If the state seeks restitution from McDonough on remand, of course, it may need to deal with the complications caused by the bankruptcy, including the stay.

so the payment does not moot the appeal unless the appellant has relinquished his right to seek repayment if he wins.").[4]

Before we granted the emergency stay, IDOT paid McDonough approximately $1.3 million as a result of the TRO. These disputed payments were made because, and only because, the TRO compelled Grunloh and Schneider to execute otherwise unenforceable contracts. These contracts, which the district court required Grunloh and Schneider to sign under threat of contempt sanctions, would remain legally binding even after the expiration of the TRO. As the parties explained at oral argument, the emergency stay interrupted the ongoing payments that the district court had ordered, and those

---

[4] If a private party appeals a TRO or preliminary injunction that forced it to make payment to the state, mootness is a more pressing concern. Ordering a state to reimburse a private party based on payments compelled by an erroneous injunction exceeds our judicial power. In such cases, the Eleventh Amendment would bar the relief sought on appeal, namely the payment of funds back to the plaintiff. See *Porco v. Trustees of Indiana Univ.*, 453 F.3d 390 (7th Cir. 2006) (dismissing as moot an appeal of an injunction ordering private party to make payments to state university; plaintiff had already made payments to state defendants, so the Eleventh Amendment barred the remedy sought by the appeal); 13B Wright & Miller, *Federal Practice & Procedure, Jurisdiction & Related Matters*, § 3533.2.2 (3d ed. 2012) ("Payment of a money judgment, however, may moot an appeal if some legal obstacle, such as the Eleventh Amendment, prevents the court from ordering repayment.").

payments would continue absent a decision by this court on the propriety of the TRO in the first place. Thus the question of the state's Eleventh Amendment immunity "is not merely academic." *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (per curiam). The state officials have "an interest in being dismissed from this action in order to eliminate the danger of being held in contempt if [they] should fail to comply with the mandatory injunction." *Id.*

## B. *The Eleventh Amendment*

Having established jurisdiction, we turn to the application of the Eleventh Amendment. In *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793), the Supreme Court allowed an action by a private citizen of South Carolina against the State of Georgia to collect a debt incurred during the American Revolution. One member of the majority explained that the "concept of sovereignty had no place in democracy [and] sovereign immunity could not preclude federal court jurisdiction." John E. Nowak, *The Scope of Congressional Power to Create Causes of Action Against State Governments and the History of the Eleventh and Fourteenth Amendments*, 75 Colum. L. Rev. 1413, 1431 n.109 (1975), citing *Chisholm,* 2 U.S. (2 Dall.) at 454-58 (opinion of Wilson, J.). The *Chisholm* decision "created such a shock of surprise that the Eleventh Amendment was at once proposed and adopted." *Monaco v. Mississippi*, 292 U.S. 313, 325 (1934). The Eleventh Amendment rejected *Chisholm*, commanding: "The Judicial power of the United States shall not be construed to

extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The Eleventh Amendment established that "each State is a sovereign entity in our federal system; and second, that [it] is inherent in the nature of sovereignty not to be amenable to the suit of an individual without [a State's] consent . . . ." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) (internal quotations omitted). Accordingly, the general rule is that private individuals are unable to sue a state in federal court absent the state's consent.

*Ex parte Young* recognized what has become one of several well-established exceptions to the Eleventh Amendment bar on suing states in federal court, permitting private citizens to sue state officials in their official capacities to require them to comply with federal law on an ongoing basis. 209 U.S. 123 (1908). In such cases, the state official is violating federal law and therefore "the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity." *Id.* at 159. *Ex parte Young* employed a chameleon-like legal fiction, reasoning that when a state official violates the federal Constitution, that official is "stripped of his official or representative character" and thus also of any immunity defense. *Id.* at 160. In these kinds of cases, "the officer is simply prohibited from doing an act which he had no legal right to do." *Id.* at 159; see also *Indiana Protection & Advocacy Svcs. v. Indiana*

*Family & Social Svcs. Admin*, 603 F.3d 365, 371 (7th Cir. 2010) (en banc) (collecting cases applying *Ex parte Young* exception). The *Ex parte Young* exception allows the lower federal courts to enforce federal law against the states themselves, so that plaintiffs asserting federal rights against the states have recourse to federal courts short of the Supreme Court itself.

*Edelman v. Jordan* explained the limits of the relief a court may grant under *Ex parte Young*. 415 U.S. 651 (1974). In *Edelman*, plaintiffs sought declaratory and injunctive relief for injuries suffered when a state agency incorrectly administered a federal-state program providing aid to the elderly, blind, and disabled. Plaintiffs also sought money damages for all "benefits wrongfully withheld." *Id.* at 656. The Court affirmed the grant of injunctive and declaratory relief but vacated the retroactive monetary award as barred by the Eleventh Amendment. *Edelman* thus prohibited relief that was not prospective in nature, specifically barring awards of "accrued monetary liability which must be met from the general revenues of a State." *Id*. at 664. The Court recognized, of course, that, in some cases injunctive relief ordering the state to stop violating federal law on an ongoing basis might cost the state money. *Id.* at 667-68, discussing *Goldberg v. Kelly,* 397 U.S. 254 (1970). This was acceptable in such cases because "the fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature." *Id.* at 667-68.

In such cases, the state expenditure was an ancillary rather than primary effect of the relief ordered and there-

fore did "not involve individual citizens' conducting a raid on the state treasury for an accrued monetary liability." *Milliken v. Bradley*, 433 U.S. 267, 290 n.22 (1977). Cf. *Bowen v. Massachusetts*, 487 U.S. 879, 893-94 (1988) ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.' Thus, we have recognized that relief that orders a town to reimburse parents for educational costs that Congress intended the town to pay is not 'damages.' ").

A payment of state funds, however, that is not "a necessary consequence of compliance in the future with a substantive federal-question determination," is not permitted. *Edelman*, 415 U.S. at 668. The Eleventh Amendment was adopted to ensure that such retroactive damages claims would not be heard in federal court absent the state's consent. Thus, courts may enjoin ongoing behavior by state officials that violates federal law. They may also order state officials to act in a certain manner going forward that may cost the state money to implement. They may not, however, direct a state to make payments to resolve a private debt or to remedy a past injury to a private party.[5] The district

---

[5] The federal courts retain the ability to ensure that state agencies and departments comply with the conditions and requirements set forth in federal grant and aid programs, for example. See, *e.g.*, *Quern v. Jordan*, 440 U.S. 332 (1979) (holding that injunction that state officials must inform individuals that they are entitled to apply to state for wrongly withheld

(continued...)

court determined that the relief sought by McDonough fell under the *Ex parte Young* exception and therefore was not barred by the Eleventh Amendment. This determination was in error for reasons we now explain.

### C. *The TRO*

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into

---

[5] (...continued)

benefits is not retroactive and thus not barred by Eleventh Amendment, even though such applications may ultimately result in state expenditures of money); see also James M. Hirschhorn, *Where the Money Is: Remedies to Finance Compliance with Strict Structural Injunctions*, 82 Mich. L. Rev. 1815, 1864 (1984) (pointing out that in these types of cases "the payment of retroactive benefits will depend on the assent of the state authorities, including the appropriation of funds by the legislature"). State sovereign immunity and federal oversight are thus compatible because the state has the "option to stop providing a program if it chooses not to meet federal legal requirements for engaging in the activity." *Id*. Cf. *Bowen v. Massachusetts*, 487 U.S. 879, 893-95 (1988) (explaining distinction between money damages understood properly as compensatory relief "to *substitute* for a suffered loss" and specific remedies that do not substitute for a loss "but attempt to give the plaintiff the very thing to which he is entitled") (internal quotations and citations omitted). Nothing in this opinion should call into question this established power of the federal government.

whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md. Inc. v. Public Svcs. Comm'n of Md.*, 535 U.S. 635, 645 (2002), quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997). McDonough argues it has a property right to the money bound up in the unsigned supplemental agreements and that defendants' refusal to sign the supplemental agreements deprived it of this property right without its federal Constitutional right to due process. Based on this argument, McDonough persuaded the district court to order the state officials, Grunloh and Schneider, to sign the agreements and thus authorize payment of the alleged debts.

McDonough recognizes that the Eleventh Amendment bars federal courts from ordering the state to disburse funds to a private party for retroactive damages but argues that this case falls under the *Ex parte Young* exception to state sovereign immunity. McDonough argues that the relief requested is not payment for a past injury but rather a court order that defendants resume the normal course of business. Framing the relief in this way, McDonough has tried to shoehorn its request into *Ex parte Young* by characterizing it as a prospective decree that merely ordered state officials to stop violating its federal due process rights. As we explained above, however, the only prospective action that remains before payment is for Grunloh and Schneider to sign the supplemental agreements.

While the payment of funds is indeed the second step following from the TRO after the procedural act of

signing, it is more importantly the primary effect. *Ex parte Young* and its progeny permit equitable relief resulting in the state expenditure of funds only when that expenditure is an ancillary, not primary, effect of the relief. McDonough essentially requested and received retroactive damages for the alleged breaches of contracts or, as the district court put it, "payment for past services." The TRO restored "any flow of funds that were attributable not to the future services, not to the continuation of services, but the prior services." We find that this relief is clearly barred by the Eleventh Amendment as reflected in *Edelman*.

Here the relief sought, "processing of paperwork," was tantamount to signing a check made out to plaintiff, as all parties and the district court understood. Such relief clearly violates *Edelman* and thus cannot be saved by reliance on *Ex parte Young*. Casting this relief in terms of the act of signing as opposed to the act of paying does not make the payment, though second in time, ancillary. The only purpose of the compelled signatures was to secure payment. "*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury . . . or an order for specific performance of a State's contract . . . ." *Virginia Office for Protection & Advocacy v. Stewart,* 131 S. Ct. 1632, 1639 (2011) (internal quotations omitted); see also *MSA Realty Corp. v. Illinois,* 990 F.2d 288, 294 (7th Cir. 1993) ("Even after *Ex parte Young* was decided in 1908, the Supreme Court has never approved a lower court order requiring officials of a state to take actions that constitute performance by a state of obligations that are the

state's in its political capacity."); *Zych v. Wrecked Vessel Believed to be the Lady Elgin*, 960 F.2d 665, 669 (7th Cir. 1992) ("*Edelman* holds that courts may command public officials to obey the Constitution and federal statutes as they carry out their duties in the future but may not direct them to invade the state treasury to make good for past misdeeds.").

*Council 31 of AFSCME v. Quinn*, recently decided by this court, is instructive. 680 F.3d 875 (7th Cir. 2012). In *Council 31*, we considered the claim that the state's decision to freeze employees' salaries and wages violated the employees' collective bargaining agreements. A public employee union requested a preliminary injunction compelling the state to pay the wages set by the collective bargaining agreements, arguing that the failure to do so would violate the Contracts and Equal Protection Clauses of the federal Constitution. We found the fact that the injunction requested by the union would not "specifically require the court to direct payment of funds out of the State's treasury" to be "immaterial." *Id.* at 883-84.

We explained: "It is necessary to look not at the type of relief sought, but the effect the relief would have on the State if it were afforded to the plaintiff." *Id.* at 883. The essential nature of the relief sought would "require direct payments by the state from its treasury," which would thus "force the defendants acting in their official capacities to extract funds from the State's treasury for the ultimate benefit of the plaintiffs." *Id.* at 883-84 (internal quotations omitted). This ultimate result would have

violated the Eleventh Amendment and we therefore affirmed the district court's denial of the requested relief, holding that the *Ex parte Young* exception did not apply. That same analysis applies equally here. Thus, we are not persuaded by McDonough's creative styling of its claim. It remains in substance a prayer for relief based on state law for an alleged "monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials," which is barred by the Eleventh Amendment. *Edelman*, 415 U.S. at 668. The TRO thus exceeded the boundaries set by the Eleventh Amendment by ordering state officials to pay a private party for an alleged debt.

The idea that a state should make good on its contracts has considerable appeal to judges, lawyers, and state creditors, and that was exactly what the Supreme Court ordered in *Chisholm v. Georgia*:

> A state, like a merchant, makes a contract. A dishonest State like a dishonest merchant, willfully refuses to discharge it: The latter is amenable to a Court of Justice: Upon general principles of right, shall the former when summoned to answer the fair demands of its creditor, be permitted, proteus-like, to assume a new appearance, and to insult him and justice by declaring I am a Sovereign State? Surely not.

2 U.S. (2 Dall.) 419, 456 (1793) (opinion of Wilson, J.). As understandable as that view may be, the Eleventh Amendment was a swift and direct rejection of it, and it deprived federal courts of the power to issue such orders without the state's consent. We understand the predicament that McDonough described and the

district court's response to it, especially when the court was told that failure to enter the TRO would result in bankruptcy and lost jobs. Those reasons, however, do not authorize the district court or us to avoid complying with the Eleventh Amendment.

The temporary restraining order of the district court is VACATED and the case is REMANDED for further proceedings consistent with this opinion.