THE PEOPLE *ex rel.* ILLINOIS HISTORIC PRESERVATION AGENCY *et al.,* Plaintiff-Appellant, v. HARRY ZYCH, d/b/a American Diving and Salvage Company, *et al.,* Defendants-Appellees.

First District (6th Division) No. 1—96—2223

Opinion filed October 31, 1997.

ZWICK J., concurring in part and dissenting in part.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and John P. Schmidt, Assistant Attorney General, of counsel,) for appellant.

Paul N. Keller, of Park Ridge, for appellees.

Richard T. Robol, of Columbus, Ohio, *amicus curiae*.

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

In 1860, a ship named the *Lady Elgin* sank in Lake Michigan following a collision with the schooner *Augusta*. In 1989, 129 years later, defendant Harry Zych discovered the shipwreck. The instant action concerns competing claims to the ownership of the wreckage.

Plaintiff, the State of Illinois *ex rel*. Illinois Historic Preservation Agency and Department of Transportation (the State), claims title to the *Lady Elgin* shipwreck under the Federal Abandoned Shipwreck Act of 1987 (the Act) (43 U.S.C. §§ 2101 through 2106 (1988)).

Defendants CIGNA Property and Casualty Insurance Company (CIGNA) and the Lady Elgin Foundation, Inc. (the Foundation), claim that they jointly hold title. Defendant Harry Zych (Zych) created the Foundation and located the shipwreck. CIGNA is the successor in interest to the Aetna Insurance Company (Aetna), which insured the *Lady Elgin* and its cargo in 1860. CIGNA assigned a portion of its interest in the shipwreck to the Foundation.

Following a bench trial, defendants were awarded title based on the determination that (1) Aetna became the owner of the wreck and its contents when it paid off claims in 1860; and (2) Aetna had not abandoned its ownership interest in the intervening 129 years.

This appeal raises three issues: (1) whether Aetna, the predecessor of CIGNA, acquired title to the *Lady Elgin* when it paid the insurance claims to the ship's owner; (2) assuming Aetna acquired title, whether Aetna abandoned its interest; and (3) whether the State established that the *Lady Elgin* was listed or determined eligible for listing in the National Register of Historic Places.

We find that Aetna acquired title to the *Lady Elgin*. We also find that Aetna/CIGNA abandoned its interest in the shipwreck and that the *Lady Elgin* shipwreck was listed in the National Register of Historic Places for purposes of the Act. Accordingly, we reverse the trial court's order that awarded title to defendants.

The history and legacy of the *Lady Elgin* have been well documented as the second-greatest tragedy in the history of the Great Lakes and have been celebrated in both story and song. *Zych v. Wrecked Vessel Believed To Be the "Lady Elgin,"* 960 F.2d 665, 666-67 (7th Cir. 1992).

On the evening of September 7, 1860, the *Lady Elgin* left Chicago on its way to Wisconsin. On board the ship were 393 passengers, including members of a militia group called the Union Guards from an Irish, Democratic ward in Milwaukee who had taken their wives, children and friends to Chicago to attend a political rally for Stephen Douglas, a presidential candidate against Abraham Lincoln.

As the passengers danced to the music of the bands in the deck areas, a thunderstorm developed. About 2 a.m., a schooner named the *Augusta* rammed the *Lady Elgin* and continued its course to Chicago. Within 30 minutes after the collision, the *Lady Elgin* broke into pieces and sank about 10 miles off shore. Rescue efforts saved only 96 of the 393 passengers on board. Legend has it that the disaster caused the transfer of political power in Milwaukee from the Irish to the Germans because so many Irish political activists died in the shipwreck.

The wreckage remained undiscovered until Zych found it in 1989,

a few miles off the shore of Highland Park. To assert ownership rights as the finder of the wreckage, Zych filed an *in rem* admiralty action in the United States District Court for the Northern District of Illinois. *Zych v. The Unidentified, Wrecked & Abandoned Vessel, Believed To Be the SB "Lady Elgin,"* 755 F. Supp. 213 (N.D. Ill. 1990).

The ownership rights of the *Lady Elgin* were the subject of federal litigation from August 1989 (the filing of Zych's admiralty action) until July 1992 when the federal district court entered an order declaring that the *Lady Elgin* Foundation, and not Harry Zych, "is the sole owner of the shipwrecked vessel believed to be the *Lady Elgin* as against all the world with the exception of the State of Illinois." *Zych v. The Unidentified, Wrecked & Abandoned Vessel, Believed To Be the SB "Lady Elgin,"* No. 89—C—6501 (1992) (unpublished judgment order).

In September 1992, the State filed the instant cause of action seeking a declaratory judgment and asserted that it owned the shipwreck under the Act. In May 1996, the trial commenced.

Zych testified that he is a professional diver and engages primarily in salvage and oil field activity. Zych first became involved in the *Lady Elgin* in 1969 when he went wreck diving with some local divers. Zych later researched the history of the ship and began his own underwater search in 1971. From 1972 through 1989, Zych's search was not a full-time job but rather an activity he did on weekends and when time allowed away from his regular job. In 1989 Zych located the *Lady Elgin* in 53 feet of water in Lake Michigan about four miles off shore from Highland Park.

At trial, the State admitted into evidence copies of six letters from 1860 relating to the *Lady Elgin* and partial reconstructions of those letters. CIGNA, Aetna's successor, recovered these documents from the archives of Aetna. The letters were authored by Thomas Alexander, who was a vice-president of Aetna, or by E.G. Ripley, who was the president of Aetna.

By letter dated September 11, 1860, Alexander wrote to Aetna's agents in Chicago (Hubbard and Hunt) and stated that he had been informed by telegraph of the loss of the *Lady Elgin*. Alexander wrote "hope we escape any claims on *** cargo." Gurdon Saltonstall Hubbard was both an agent of Aetna and the owner of the *Lady Elgin*.

By another letter dated September 11, 1860, Alexander wrote to an Aetna agent in Buffalo, New York (Captain E.P. Door), about the ship named *Augusta*, *i.e.*, the ship that collided with the *Lady Elgin*, causing it to sink. Alexander stated that the newspapers reported that the *Augusta* had "been libelled for $42,000" and asked whether this had been done by the owners of the *Lady Elgin*.

By letter dated September 13, 1860, Ripley wrote to J.B. Bennett, who is identified in the transcription notes as Aetna's general agent in Cincinnati, Ohio. Ripley stated that "[w]e had $5000 on the 'Lady Elgin' and $2500 on cargo—the Boat belonged to Mr. Hubbard mainly."

By letter dated September 22, 1860, Ripley wrote to Hubbard and Hunt in Chicago. Ripley acknowledged receipt of "papers relating to claims for" the *Lady Elgin*, including invoices of certain shipments. Ripley stated that "[w]e wish to pay these claims as soon as they are properly proved—let them be thus prepared, and reduced to the cash point and pay them."

By letter dated October 10, 1860, Alexander wrote to Hubbard and Hunt in Chicago. The letter states that the *Lady Elgin* "gave us a strong pull upon our small receipts." The letter further states:

> "We regret that Mr. Hubbard declines to allow us the legal interest? off his claim because we should prefer to pay it at that rate—and because we think the circumstances would justify his concession of the legal interests in this case—however, we shall not discuss the point and permit the claim to layover until its maturity. [P]ermit us to confirm Capt. Dorr instructions not to accept an abandonment of the vessel, for the reason which he informs us he gave you on his recent visit to Chicago."

In the sixth and final letter, dated November 15, 1860, Alexander wrote to Hubbard and Hunt in Chicago and stated that "[w]e take notice of the payment of $11993 20/100 to GSHubbard in full of policy on Lady Elgin."

Three witnesses testified as marine insurance experts: (1) Victor Simone, for the State; (2) Ivan Avery, called by the State; and (3) George Stellwag, for defendants.

As the State's witness, Victor Simone opined that Aetna never acquired title to the *Lady Elgin* based upon (1) a response by CIGNA in a request to admit where CIGNA "[a]dmitted that on October 10, 1860, an abandonment of the *Lady Elgin* was not accepted by Aetna"; (2) the absence of anything to indicate that Aetna acquired title; and (3) common and economic sense that would prompt an insurance company not to want any part of the wreck that had very little salvage value and not to want to assume any potential liabilities. Referring to the October 10, 1860, letter, Simone testified that the letter clearly indicates that Aetna would not accept abandonment. Simone further opined that, even assuming that Aetna acquired title, Aetna's actions prove that it abandoned any interests in the vessel.

Simone testified that in the maritime insurance field, the "acceptance of abandonment" means that the insurance company accepts

complete responsibility for the vessel and has title to it. With the acceptance of abandonment, an insurance company accepts the liability associated with the abandonment, most especially the removal of the wreck. An insurance company's refusal to accept abandonment signifies that it does not wish to own the vessel and declines to take title to it.

Simone testified that the payment of claims by the insurance company has nothing to do with acceptance or rejection of abandonment but, rather, is determined by whether the claim was covered by the policy. The claim for the loss of *Lady Elgin* was paid because the insurance policies covered collision. Refusing to accept abandonment occurs when the insurance company pays the claims and then refuses an offer of abandonment. Such a refusal means that the insurance company does not want to accept title to the vessel, does not want any part of the vessel, and is just paying the claim. Simone stated that an insurance company's refusal to accept abandonment is "very common" and he is not familiar with any instance where an insurance company accepted abandonment. Simone explained that if an insurance company accepted abandonment, it "would then become responsible for anything that would occur for which [it] could be held legally liable." Silence on the part of the insurance company is not enough to accept abandonment and, instead, indicates that it does not want any part of the vessel.

Simone testified that acceptance or rejection of abandonment, *i.e.*, accepting or not accepting title, has nothing to do with subrogation. According to Simone, subrogation has nothing to do with title, and the rights of subrogation against third parties have nothing to do with ownership of a vessel.

Simone explained, and the other experts agreed, the difference between a total loss of a vessel and a constructive total loss. A total loss means that there is no value to the vessel whatsoever. For example, a total loss would be a vessel that sinks in 5,000 feet of water without any hope of getting it back up again. A constructive total loss would exist if the cost of recovering the vessel or salving the vessel would far exceed its insured value. Simone testified that the *Lady Elgin* was a total loss. Simone further testified that an insurance company never has to accept title to the vessel.

Ivan H. Avery is a vice-president of Recovery Insurance International, a company owned by the CIGNA Corporation. Avery had CIGNA engage in a search to locate any documents relating to the *Lady Elgin*, and the search produced only the six 1860 letters that were introduced. In addressing the lack of documentation, Avery explained that, in 1860, claims were handled, received, and paid in

the field, not in the home office, due to the problems with transmission of information at that time. Thus, according to Avery, the policy and claim information would have been located in the agency in Chicago, not in Hartford, Connecticut. Avery believed that the original policy and claim information were in Chicago and burned in the Chicago fire because Hubbard and Hunt's office was totally destroyed in that fire. Avery further testified, however, that he would have expected more than six letters to have been found and that some documents or files were destroyed over time.

Avery opined that Aetna accepted abandonment based on two of the 1860 letters, October 10 and November 15. Avery testified that, although the letters do not specifically state that Aetna accepted abandonment, the November 15 letter specifically states that the claim was paid and the payment of the claim was considerably higher than the value stated in the policy. Avery testified that abandonment could not be accepted until the claim was paid.

Avery testified that an insurance company has a choice to accept or reject abandonment and, if it does not accept abandonment, it does not become the owner of the vessel. Acceptance of abandonment means acceptance of any potential liabilities that might be associated with the vessel, such as unregistered cargo, loss of lives, and the recovery of the vessel.

Avery testified that the *Lady Elgin* was a total loss. Although the *Lady Elgin* itself had no value because it was no longer salable, some of the equipment and the contents of the vessel had value. Although CIGNA was not able to find a cargo list for the *Lady Elgin*, the known contents of the ship included boilers, cattle, and rifles. The primary value of the *Lady Elgin* today is its historical value.

Avery testified that there was no need for any tendering of abandonment in a total loss case because abandonment is automatic upon payment of the loss. Avery stated that even though the insurance company had the option of not exercising ownership rights by refusing to accept abandonment, the practice in 1860 "with very, very few exceptions *** was for the company to accept the ownership of a vessel in a case of a total loss."

Referring to a September 11, 1860, letter, Avery testified that the $42,000 possible liability of the *Augusta* for the loss of the *Lady Elgin* was a factor for Aetna to consider because the potential liability of the *Augusta* would be favorable to the owner of the *Lady Elgin*. Assuming that there was an abandonment of the vessel by its original owner, the subrogation rights would go to the insurance company and would include a cause of action against the *Augusta* or any other potentially liable entity or individual. The potential for subrogation

recovery would be a very strong factor for Aetna to consider in determining whether to accept abandonment. Avery does not know whether the *Augusta* was ever required to pay the $42,000.

George Stellwag, a marine insurance consultant, testified on behalf of defendants. Stellwag believed that since Hubbard was both an agent of Aetna and the owner of the ship, Alexander wanted to oversee some of the loss payments in relation to that claim. Stellwag agreed with the other experts that the *Lady Elgin* was a total loss.

Stellwag testified that, once the claim is paid by the underwriters on a total loss of a vessel, ownership goes to the underwriters and this passage of title need not be evidenced in writing. Stellwag believed that the entry "not to accept abandonment of the vessel," in the October 10, 1860, letter was a recommendation because it was too early to decide whether to accept or reject abandonment. Stellwag testified that "abandonment takes place at the payment of the total loss, and so there would be no necessity prior to that to make any decision." Even after the payment of claims, however, the insurer can still refuse to accept title.

Three witnesses testified about the feasibility of locating the wreckage of the *Lady Elgin* over the course of time: Robert Kutzleb, Martin Klein, and Taras Lyseenko.

Robert Kutzleb, who testified on behalf of the State, had no doubt that the wreckage could have been found in 1860 if a concerted effort had been made but opined that it would not have made economic sense in 1860 for anyone to engage in such an effort. Kutzleb described four rudimentary methods of underwater search available in 1860. One method, referred to as the wire span method, was to run a wire between two ships that were spaced apart at a fixed distance. The wire would be lowered to the bottom, and the ships would proceed very slowly to drag the wire along the bottom. If the wire caught on anything, the ships would slow down and be drawn together. A second option would have been for one or more ships to troll while dragging one or more grapples, which are hooks with tines turned up. The grapple would snag on objects located underwater. Similarly, a third option would have been to drag a fish net underwater. A fourth available alternative would have been to use divers to search underwater. Diving apparatus was available in 1860. Kutzleb testified that all four of the search methods described would have worked to find the shipwreck, which was located at a depth of 53 feet.

Kutzleb further testified that the approximate location of the ship would not have been difficult to ascertain after the wreck. The appropriate search area could have been easily established in 1860 because pieces of the ship, items from the ship and passengers on the

ship came ashore at known points. In addition, a tugboat found a piece of the ship's bow anchored about six miles from the shoreline. In fact, Zych found the same bow and anchor seven miles from the shore. Moreover, the 250 rescuers on the shoreline saw bodies and cargo drifting in the water. Kutzleb stated that, from this information, "a wonderful line of bearing" could have been established from these points.

Martin Klein, who testified on behalf of defendants, opined that the use of the dragging method of locating a shipwreck would have been very difficult because the ship was broken into many pieces. The state of the art in salvage technology in 1960, according to Klein, was also "very rudimentary." Klein believed that the main reason it took so long to discover the shipwreck was because the wreck was not located where the general accounts placed it. Klein opined that the chances of locating the *Lady Elgin* before 1989 were "almost negligible" given the search and navigational technology available during the time frame of Zych's search, *i.e.*, 1970-89. Klein also opined that using then-existing technology, the shipwreck could have been found in the late 1960s.

Taras Lyseenko, who testified on behalf of defendants, described his occupation as a shipwreck treasure hunter. Lyseenko engaged in a three-day search for the *Lady Elgin* and came within about five miles of the wreck. Lyseenko did not view the search as a profit-making venture and did not put major effort into the search. Lyseenko testified that the *Lady Elgin* could have been found in 1860 with enough manpower, money and equipment.

Zych testified that the shipwreck could have been located in 1860 with a great degree of difficulty. Zych testified that the EG&G sidescan sonar was sufficient to locate the shipwreck in 1967 but opined that it was not commercially feasible to begin searching for the *Lady Elgin* before 1971.

William Wheeler is employed by the State of Illinois in the Historic Preservation Agency. Wheeler's duties include the overseeing of the process of nominating sites to the National Register of Historic Places in Illinois. In his capacity as the state historic preservation officer, Wheeler authored a letter on March 9, 1994, with a nomination of the *Lady Elgin* shipwreck site to the National Register of Historic Places. Eventually, on February 17, 1995, the *Lady Elgin* shipwreck was listed on the National Register of Historic Places.

On May 13, 1996, the trial court entered judgment in favor of defendants. The trial court found that the State had not established an abandonment by Aetna of an interest in the ship. The trial court also noted that the State had not established abandonment under ei-

ther of two standards: by a preponderance of the evidence or by strong and convincing evidence. The trial court also found that the alleged register of the ship on the National Register of Historic Places was seriously questionable but, in effect, not relevant in light of the finding of no abandonment.

On appeal, the State asserts that Aetna never obtained an ownership interest in the *Lady Elgin* because the admission by CIGNA that Aetna refused to accept an abandonment as of October 10, 1860, constitutes a conclusive admission that Aetna never acquired title. The State also maintains that a refusal to accept abandonment cannot occur before the insurance company pays the claims.

Defendants contend that Aetna acquired ownership by virtue of payment on the insurance policies. We agree with defendants.

In number 46 of the State's request to admit facts to CIGNA, the State propounded the following fact: "Aetna refused or declined to accept abandonment of the Lady Elgin." CIGNA answered: "Admitted that on October 10, 1860, an abandonment of the *Lady Elgin* was not accepted by Aetna." The October 10, 1860, letter referenced in the admission, authored by Alexander of Aetna and sent to Aetna's agents in Chicago (Hubbard and Hunt), stated: "Permit us to confirm Capt. Dorr instructions not to accept an abandonment of the vessel, for the reason which he informs us he gave you on his recent visit to Chicago."

In number 48 of the State's request to admit facts to CIGNA, the State propounded the following fact: "At no time did Aetna or CIGNA accept an abandonment of the Lady Elgin." CIGNA responded "Denied."

The State's reliance on number 46 of its request to admit facts as conclusive to Aetna's rejection of abandonment ignores CIGNA's absolute denial as stated in number 48. Defendants' position has remained the same in pretrial proceedings and at trial, *i.e.*, on October 10, 1860, Aetna would not accept abandonment but the subsequent payment of claims in full by Aetna on November 15, 1860, constituted acceptance of abandonment and transfer of title as a matter of law.

■ Under the guidelines to the Act, an insurance company acquires title to a wrecked vessel upon the payment of the full value of the vessel to the owner:

"When the owner of a sunken vessel is paid the full value of the vessel (such as receiving payment from an insurance underwriter) the shipwreck is not considered to be abandoned. In such cases, title to the wrecked vessel is passed to the party who paid the owner." Abandoned Shipwreck Act Guidelines, 55 Fed. Reg. 50120-21 (1990).

Relying on this regulation, the ninth circuit held that when the insurance companies paid claims on the wrecked vessel, they "took title to at least part of the wreck by right of subrogation and under the [Act's] regulations." *Deep Sea Research, Inc. v. The Brother Jonathan*, 102 F.3d 379, 388 (9th Cir. 1996). The only records available in the *Brother Jonathan* case were newspaper accounts published at the time of the shipwreck, *i.e.*, 1865. *Brother Jonathan*, 102 F.3d at 382. The newspaper accounts stated that about one third of the cargo on board was insured and there was no evidence that the ship itself was insured. *Brother Jonathan*, 102 F.3d at 382. Thus, the ninth circuit based its holding that insurance companies acquired title on "a newspaper article dating from the time of the wreck listing a number of insurance companies that insured the cargo of the" wrecked vessel. *Brother Jonathan*, 102 F.3d at 388.

■ If the newspaper accounts and partial insurance coverage were sufficient to hold that the insurance companies acquired title in *Brother Jonathan*, the instant case most certainly has enough evidence to establish that title passed to Aetna in 1860. In the present case, there is no dispute that Aetna insured the *Lady Elgin*, that the wreck was a total loss, and that Aetna paid the owner of the ship (Hubbard) under the insurance policy. By letter dated September 13, 1860, Aetna insured the ship for $5,000 and the cargo for $2,500 ("[w]e had $5000 on the 'Lady Elgin' and $2500 on cargo"). By letter dated November 15, 1860, Aetna acknowledged payment of $11,993.20 in full payment to Hubbard, the owner of the ship ("[w]e take notice of the payment of $11993 20/100 to GSHubbard in full of policy on Lady Elgin"). Accordingly, Aetna paid about $4,500 above the policy coverage.

The experts at trial agreed that an insurer had the option to accept or reject abandonment by the ship's owner. Although the expert testimony revealed conflicting reasons as to why Aetna may have wanted to reject or accept abandonment based on potential liabilities or subrogation rights that would derive from such decision, the evidence established that payment was made by Aetna to the ship's owner and, under the Act's regulations, title then passed to Aetna.

Next, the State asserts that the passage of time and Aetna's inaction during the 129-year time period between the wreck of the *Lady Elgin* (1860) and the discovery of the wreckage (1989) compel a conclusion that Aetna abandoned any interest that it held in the ship. The State argues that, as a matter of law, Aetna abandoned any interest when it made no effort to recover the wreckage, did not explore the possibility of recovering the wreckage, and displayed no interest in the ship for a period of 129 years. We agree.

■ The Act provides that the federal government asserts title to certain abandoned shipwrecks and then transfers the title to the state where the shipwreck is located. 43 U.S.C. §§ 2105(a), (c) (1988). To qualify under the Act, the shipwreck must be (1) abandoned; (2) embedded in submerged lands of a state; and (3) "included in or determined eligible for inclusion in the National Register." 43 U.S.C. § 2105(a)(3) (1988). In the present case, the trial court took judicial notice of the fact that the *Lady Elgin* is located in the submerged lands of Illinois and this element of the Act is not in dispute on appeal.

The sole inquiry under the Act "is whether a ship has been abandoned so as to give the state a claim." *Fairport International Exploration, Inc. v. Shipwrecked Vessel Known as The Captain Lawrence,* 105 F.3d 1078, 1085 (6th Cir. 1997). Whether a vessel has been abandoned is a factual question to be reviewed for clear error. *Fairport,* 105 F.3d at 1082.

The term "abandoned" is not defined in the Act. However, as previously stated, the guidelines to the Act provide:

"(a) When the owner of a sunken vessel is paid the full value of the vessel (such as receiving payment from an insurance underwriter) the shipwreck is not considered to be abandoned. In such cases, title to the wrecked vessel is passed to the party who paid the owner." 55 Fed. Reg. 50120-21 (1990).

Defendants assert that subsection (a) of this regulation is dispositive of the issue here because the November 15, 1860, letter noted "the payment of $11993 20/100 to GSHubbard in full of policy on Lady Elgin."

The State argues that, under defendants' interpretation, an insurer that takes title by paying claims can never lose title by abandonment. Defendants' view, according to the State, is inconsistent with the language of the definition taken as a whole and with the Act's intent that historic shipwrecks be managed by the states. Moreover, the guidelines are not binding. H.R. Rep. No. 100—514, pt. 2, at 7 (1988), reprinted in 1988 U.S.C.C.A.N. 370, 375 ("[w]hile recognizing that the guidelines are nonbinding, the Committee strongly encourages the states to act consistently with the guidelines").

We agree with the State's position. Although subsection (a) authorizes the transfer of title to Aetna in 1860 upon the payment of the insurance claims, it does not provide that the new owner could never abandon its interest. To accept defendants' position on this guideline as absolute would defeat the entire purpose of the Act.

■ Ships have lured seekers of treasures since the days of

discoverers of new lands and pirates. Likewise, courts have entertained legal disputes over sunken ships and their buried valuables. To resolve such disputes, courts generally and historically have employed the law of finds or the law of salvage. In short, the law of finds espouses the principle of finders, keepers. The law of salvage allows the original owners of the wrecked ships and their cargo to retain ownership but also grants the salvors compensation for their service. See *Columbus-America Discovery Group v. Atlantic Mutual Insurance Co.*, 974 F.2d 450 (4th Cir. 1992) (held that the underwriters had not abandoned their interest in a ship that sank in 1857 and was found in 1987, and that the law of salvage should be applied); see also Annotation, *Rights in and Ownership of Wrecked or Derelict Vessels and Their Contents Not Cast Upon the Shore*, 63 A.L.R.2d 1369 (1959).

The United States Congress, however, in an unusual legislative move, expressly abrogated the laws of finds and salvage in the Act. Section 2106 specifically provides that "[t]he law of salvage and the law of finds shall not apply to abandoned shipwrecks to which section 2105 of this title applies." 43 U.S.C. § 2106(a) (1988). Furthermore, the Act was effective only to legal proceedings brought after April 28, 1988. 43 U.S.C. § 2106(c) (1988).

The legislative history of the Act recognized that admiralty law developed to encourage the salvage of commercial goods and, thus, its focus is commercial, not cultural resource management or recreation. As technological advances substantially have eased access to shipwrecks, tens of thousands of shipwrecks have been located. Simultaneous with the increased discovery of shipwrecks, historic shipwrecks, containing both historic information and tangible artifacts, have increasingly been recognized as cultural resources needing greater protection. H.R. Rep. No. 100—514, pt. 1, at 1 (1988), reprinted in 1988 U.S.C.C.A.N. 365 (Background section).

With these principles in mind, the House Committee that considered the bill that became the Act observed "these admiralty principles [the laws of finds and salvage] are not well-suited to the preservation of historic and other shipwrecks to which this Act applies. *** In light of today's experience and conditions, the committee does not believe that the law of finds and the law of salvage well serve the protection of our nation's maritime heritage. This heritage is best protected by states acting through their historic preservation programs consistent with federal guidance." H.R. Rep. No. 100—514, pt. 2, at 8 (1988), reprinted in 1988 U.S.C.C.A.N. 370, 377. In addition, the House Committee stated that abandonment can be implied or inferred: "The Committee notes that the term 'abandoned' does

not require the original owner to actively disclaim title or ownership. The abandonment or relinquishment of ownership rights may be implied or otherwise inferred, as by an owner never asserting any control over or otherwise indicating his claim of possession of the shipwreck." H.R. Rep. No. 100—514, pt. 1, at 2 (1988), reprinted in 1988 U.S.C.C.A.N. 365, 366.

■ Abandonment by implication or inference is, in part, consistent with "the traditional rule that a wreck is not abandoned unless either 1) title is affirmatively renounced *or* 2) abandonment can be inferred from the lapse of time or failure to pursue salvage efforts on the part of the owners." (Emphasis in original.) *Fairport International Exploration, Inc. v. Shipwrecked Vessel Known as The Captain Lawrence*, 105 F.3d 1078, 1084 (6th Cir. 1997), *petition for cert. filed* (June 4, 1997), quoting *Deep Sea Research, Inc. v. The Brother Jonathan*, 89 F.3d 680, 688 (9th Cir. 1996), *cert. granted, California v. Deep Sea Research, Inc.*, 520 U.S. 1263, 138 L. Ed. 2d 192, 117 S. Ct. 2430 (1997). Notably, in *Fairport*, the state prevailed, a finding of abandonment was upheld, and a petition for *certiorari* is currently pending. In *Brother Jonathan*, the state did not prevail and the United Sates Supreme Court granted *certiorari*.

The sixth circuit in *Fairport* acknowledged that a second approach follows, in effect, the first prong of the traditional rule requiring an affirmative renouncement of title. This second approach requires abandonment to be shown by a voluntary act, which must be proved by a clear and unmistakable affirmative act to indicate a purpose to repudiate ownership. *Fairport*, 105 F.3d at 1085, citing *Columbus-America Discovery Group v. Atlantic Mutual Insurance Co.*, 974 F.2d 450, 461 (4th Cir. 1992).

In *Fairport*, the sixth circuit expressly held that it would "follow the lead of *Brother Jonathan* rather than that of *Columbus-America*." *Fairport*, 105 F.3d at 1085. The sixth circuit reasoned as follows: "Common sense makes readily apparent that the statute did not contemplate a court's requiring express abandonment; such explicit action is obviously rare indeed, and application of such a rule would render the [Act] a virtual nullity." *Fairport*, 105 F.3d at 1085.

We agree with the reasoning in *Fairport* and with the traditional approach, which allows abandonment to be inferred from circumstantial evidence, such as the lapse of time or failure to pursue salvage efforts on the part of the owners.

■ In the present case, a 129-year period of time lapsed between the wreck of the *Lady Elgin* and the discovery of the wreck. The last known reference made by Aetna about the ship occurred in the November 15, 1860, letter noting the payment to Hubbard. The ratio-

nale for Aetna's continued custody of the six 1860 letters for over a century cannot be known for certain. Defendants would suggest that such retention indicates Aetna's desire to assert a claim of ownership; the State suggests that Aetna wanted to document that it had paid off the claims and would not be liable for any other potential claims, such as for removing the wreckage. It is known for certain, however, that Aetna expressed no interest in the ship for 129 years and such an extended period of time strongly implies abandonment.

The expert testimony revealed that salvage efforts could have been made in 1860 through rudimentary methods but such efforts were not economically feasible. The testimony further revealed, however, that technological developments over the course of time made it far easier to locate shipwrecks in the late 1960s and early 1970s. Notwithstanding the availability of the technological advancements, Aetna still made no efforts to salvage the shipwreck when it had a realistic opportunity to do so for about 20 years before Zych located it.

Applying the standard that allows abandonment to be established by circumstantial evidence, and in light of the length of time in which Aetna displayed complete inaction toward the *Lady Elgin* and its inaction after the appropriate technology was developed, we find that the trial court erred in finding that Aetna did not abandon its interest. In light of the legislative history of the Act, the directives and purpose of the Act, and the inferential standard of establishing abandonment, we find that the trial court erred in finding no abandonment under the facts of this case.

Finally, defendants contest the validity of the listing of the *Lady Elgin* shipwreck in the National Register of Historic Places. Defendants, however, do not dispute that the *Lady Elgin* was listed in the National Register of Historic Places on February 17, 1995. In the alternative, assuming that the listing was proper, defendants contend that the February 1995 listing had no effect on the title to the *Lady Elgin* in May 1989 when Zych found the wreck.

■ For the Act to apply, the abandoned shipwreck at issue must be "included in or determined eligible for inclusion in the National Register." 43 U.S.C. § 2105(a)(3) (1988). The Act further provides:

> "The public shall be given adequate notice of the location of any shipwreck to which title is asserted under this section. The Secretary of the Interior, after consultation with the appropriate State Historic Preservation Officer, shall make a written determination that an abandoned shipwreck meets the criteria for eligibility for inclusion in the National Register of Historic Places under clause (a)(3) ***." 43 U.S.C. § 2105(b) (1988).

The Code of Federal Regulations authorizes the Secretary of Interior to expand and maintain the National Register, and sets forth the procedural requirements for listing properties on the National Register. 36 C.F.R. § 60.1(a) (1996) (the Code).

The state historic preservation officer is responsible for identifying and nominating eligible properties to the National Register. 36 C.F.R. § 60.6(a) (1996). The procedure for nominating and listing a property in the National Register includes an opportunity for property owners to object. 36 C.F.R. § 60.6 (1996).

The record reveals that on March 9, 1994, William Wheeler, as the Illinois state historic preservation officer, applied for the registration of the *Lady Elgin* shipwreck on the National Register of Historic Places in a letter to Carol Shull, the keeper of the National Register. Wheeler's letter notified Shull that ownership of the shipwreck was contested in both federal and state courts. Wheeler further advised Shull of the result in the federal litigation and that a consent decree had been entered in the state matter. Wheeler also informed Shull that the settlement in the state litigation was not yet complete and, in fact, was questionable because Zych would be attempting to have the settlement set aside. Furthermore, the Lady Elgin Foundation had filed an objection. Due to the ongoing state court case, Shull requested and received further documentation from Wheeler. After receiving and considering all the relevant information, the *"Lady Elgin Shipwreck"* was listed in the National Register of Historic Places on February 17, 1995.

The Act only requires that the abandoned shipwreck at issue be eligible for or listed in the National Register. The Act does not authorize a party to collaterally contest the validity of that listing. There is no dispute that the *Lady Elgin* shipwreck is listed in the National Register and, therefore, that element of the Act has been satisfied.

For all the foregoing reasons, we find that all elements of the Act have been satisfied and reverse the trial court's order that awarded title to the *Lady Elgin* shipwreck to defendants.

A few words about the dissent. First, the dissent suggests that we have invaded the domain of the trial court by reweighing the facts. Actually, there are almost no facts in dispute. Even the parties' experts do not vary greatly in their conclusions. We do, however, apply those facts, as a matter of law, in a different manner than the trial court and in accordance with the most recent cases decided under the Act.

Second, the dissent is critical of our reliance upon the provisions of the Act, its legislative history and purpose. The supremacy clause of the United States Constitution mandates that federal statutes,

together with the federal Constitution and treaties, "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. Thus, our federal Constitution provides that such enactments are the supreme law of the land and, unlike the dissent, we follow the Act.

Third, the decision in *Columbus-America*, the case upon which the dissent relies, was not decided under the Act because the shipwreck therein was discovered before the effective date of the Act. The court in *Columbus-America* discussed and rested its decision in accordance with the laws of finds and salvage, *i.e.*, laws that the Act expressly abrogated.

Fourth, the dissent does not bother to cite and discuss the cases that have been decided under the Act, let alone offer anything that would distinguish *Fairport*. In addition, the dissent fails to acknowledge the discussion among the circuits as to whether express abandonment is required or whether abandonment may be inferred from circumstantial evidence, such as the failure to do anything for 129 years with 20 of those years being within the time frame of appropriate technology.

Fifth, contrary to the dissent, the record indicates that it was Zych who contacted CIGNA in order to settle any claim about which he had concern. To the surprise of nobody, the parties were willing to share in a piece of the action.

Lastly, we are reminded of the words of Justice Frederick S. Green, one of the most distinguished members of the Illinois Appellate Court for the last two decades:

> "Perhaps my optimism in believing that frequent dissent need not damage the collegiality of the court arises from my belief that the *style of dissent* which is most *persuasive* is also one which is *collegial*. *Logic* should be the *cutting edge* of such a document. Emotional argument, ridicule, or personal attack upon other panelists which injures collegiality are usually unpersuasive to all who are not already committed to the position of the dissent and may offend even those leaning toward the legal position of the dissenter." (Emphasis in original.) F. Green, *Dissenting While on a Collegial Court of Review*, 6 App. L. Rev. 10, 16 (1994).

Reversed.

QUINN, J., concurs in all of the above except neither concurs nor dissents from the last paragraph thereof.

JUSTICE ZWICK concurring in part and dissenting in part:

I agree with the majority that Aetna/CIGNA acquired title to the *Lady Elgin* when it paid the owner's insurance claims, as well as with the majority's observation that title to a lost ship may be abandoned by inference. I must disagree, however, with my colleagues' conclusion, which is diametrically opposed to the factual findings of the trial court, that Aetna/CIGNA abandoned the *Lady Elgin* by failing to display a sufficient interest. In my view, the evidence in this case is merely conflicting and, therefore, the trial court's judgment should be affirmed.

When reviewing the findings of the trial court in a bench trial in which the evidence is conflicting, it is not the function of this court to disturb a trial court's findings and substitute its own opinions, unless the holdings of the trial court are manifestly against the weight of the evidence. *Greene v. City of Chicago*, 73 Ill. 2d 100, 110, 382 N.E.2d 1205 (1978); *Schulenburg v. Signatrol, Inc.*, 37 Ill. 2d 352, 356, 226 N.E.2d 624 (1967). The trial judge, as the trier of fact, is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof. *Schulenburg*, 37 Ill. 2d at 356; *People v. Cheek*, 93 Ill. 2d 82, 94, 442 N.E.2d 877 (1982). We may not overturn a judgment merely because we might disagree with it or might, had we been the trier of fact, have come to a different conclusion. *Schulenburg*, 37 Ill. 2d at 356.

The majority relies heavily upon the Federal Abandoned Shipwreck Act of 1987 and its history in its analysis of whether the *Lady Elgin* is an abandoned ship. The logic employed in this discussion is, however, pure sophistry. A *prerequisite* of applying the terms of the Act to the *Lady Elgin* is a prior factual determination that she has been, indeed, "abandoned." This is fundamental because neither the federal nor the state government may appropriate private property without first awarding compensation to its owner. The majority's reliance on the "legislative history of the Act," and the "directives and purpose of the Act" to conclude that the *Lady Elgin* is an abandoned ship turns the proper analysis on its head.

At trial testimony established that Aetna/CIGNA deliberately preserved, for more than a century and a quarter, those documents necessary for it to establish its ownership of the *Lady Elgin. Cf. Columbus-America Discovery Group, Inc. v. The Unidentified, Wrecked & Abandoned Sailing Vessel (Believed to be the S.S. Central America)*, 742 F. Supp. 1327, 1344-46 (E.D. Va. 1990), *rev'd on other grounds sub nom. Columbus-America Discovery Group v. Atlantic Mutual Insurance Co.*, 974 F.2d 450 (4th Cir. 1992) (where the federal district court found abandonment based upon insurers' deliberate destruc-

tion of documents). CIGNA explained that an even more complete set of documents concerning the ship would have been in CIGNA's possession had it not been for the tragedy of the great Chicago fire of 1871. When the ship was ultimately discovered, CIGNA promptly and actively engaged in negotiations with Zych and the Lady Elgin Foundation to protect its rights to the ship. With these facts in mind, the trial court reasonably concluded that the *Lady Elgin* had *not* been abandoned.

Moreover, in failing to explain precisely how and when Aetna/CIGNA abandoned the *Lady Elgin*, the majority's opinion renders the law in this area as murky as the waters of Lake Michigan itself. This holding represents a clear departure from what the proper law in this area should be, *i.e.*, that "lapse of time and nonuse are not sufficient, in and of themselves, to constitute an abandonment." *Columbus-America*, 974 F.2d at 461; see *Wilkie v. Two Hundred & Five Boxes of Sugar*, 29 F. Cas. 1247 (D.S.C. 1796) (No. 17,662); see also *Durfee v. Peoria, Decatur & Evansville Ry. Co.*, 140 Ill. 435, 437-38, 30 N.E. 66 (1892) (abandonment requires both *non-user* and the intention to abandon).

Because the record reasonably supports a finding by the trial court that Aetna/CIGNA did not abandon the *Lady Elgin*, I would affirm the judgment of the circuit court.