(No. 84514.—

THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* ILLINOIS HISTORIC PRESERVATION AGENCY *et al.,* Appellees, v. HARRY ZYCH, d/b/a American Diving & Salvage Company, *et al.,* Appellants.

*Opinion filed April 15, 1999.*

Paul N. Keller, of Park Ridge (Peter E. Hess, of Wilmington, Delaware, and David J. Bederman, of Atlanta, Georgia, of counsel), for appellants.

James E. Ryan, Attorney General, of Springfield (Barbara A. Preiner, Solicitor General, and John P. Schmidt, Assistant Attorney General, of Chicago, of counsel), for appellees.

Richard T. Robol, of Columbus, Ohio, for *amicus curiae* Columbus-America Discovery Group.

James E. Mann, Paul W. Edmondson, Elizabeth S. Merritt, Thompson M. Mayes and Edith M. Shine, of Washington, D.C., for *amici curiae* National Trust for Historic Preservation *et al.*

CHIEF JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, the State of Illinois *ex rel.* Illinois Historic Preservation Agency and Department of Transportation (State), brought this declaratory judgment action seeking a determination that it owned the remains of the shipwrecked *Lady Elgin* under the Abandoned Shipwreck Act of 1987 (Act) (43 U.S.C. § 2101 *et seq.* (1988)). The trial court found that title to the wreck belonged to defendant, CIGNA Property and Casualty Insurance, as the successor in interest to the ship's original insurer, Aetna Insurance Company, which had acquired ownership after the ship sank in 1860. The appellate court reversed, concluding that CIGNA had abandoned any interest in the ship and that ownership of the wreck thus vested in the State. 292 Ill. App. 3d 1084. We granted defendants' petition for leave to appeal (166 Ill. 2d R. 315) and now reverse the appellate court and affirm the circuit court. We note that two *amicus curiae* briefs have been submitted in support of the State: one by Columbus-America Discovery Group, and another jointly by the following organizations: National Trust for Historic Preservation; Advisory Council on Underwater Archaeology; Association for Great Lakes Maritime History; Council of American Maritime Museums; Institute of Nautical Archaeology; Landmarks Preservation Council of Illinois, Inc; National Conference of State Historic Preservation Officers; North American Society for Oceanic History; Society for American Archaeology; and Society for Historical Archaeology.

## BACKGROUND

As the facts of this case were sufficiently set forth by the appellate court, we reiterate only those essential to our determination. The *Lady Elgin* met her demise in September 1860 as a result of a collision with the lumber schooner *Augusta* during inclement weather. Aetna Insurance Company paid the *Lady Elgin*'s owner, Gurdon S. Hubbard, $11,993.20 on the loss in full satisfaction of

its obligations under a policy covering the ship and her cargo. Thereafter, the wreckage remained submerged and undiscovered until 1989, when defendant, Harry Zych, a professional salvage diver, located it off the coast of Highland Park. Zych first participated in an unsuccessful search for the *Lady Elgin* in 1969, with local divers. In 1971 or 1972, after extensively researching the shipwreck and its potential location, Zych began his own search for the vessel. Gradually updating and improving his search equipment, Zych ultimately located the ship using a "sidescan sonar." Although Zych acknowledged that his search was not full time, it was nonetheless arduous. The vessel had broken into pieces and was scattered over several miles, and proved to be some distance from the area originally reported. After the shipwreck, the vessel retained very little salvage value; its primary value today derives from its historical significance.

Shortly after locating the wreck Zych notified Ivan Avery, an officer of a CIGNA company, regarding his discovery, prompting Avery to search CIGNA's archives for documentation concerning the ship. In April 1990, Zych formed defendant, the Lady Elgin Foundation (Foundation). The Foundation and CIGNA executed an agreement under which CIGNA transferred its interest in the wreckage to the Foundation in exchange for 20% of the gross proceeds from any sale of property or artifacts subsequently recovered from the vessel.

Following the disposition of Zych's *in rem* admiralty case (see 292 Ill. App. 3d at 1087 (discussing federal litigation)), the State commenced the instant action for declaratory and injunctive relief under the Act. The complaint alleged that the *Lady Elgin* was an "abandoned shipwreck" under the Act and that the State was thus vested with title. See 43 U.S.C. § 2105(c) (1994). At the ensuing bench trial, the State attempted to prove that (1) Aetna had never obtained title to the shipwreck in

the first instance, because it had refused to accept "abandonment," or ownership of, the wreck; and (2) even if Aetna had taken title, CIGNA subsequently abandoned any claim or interest it may have held by failing to make any effort to recover the ship until it was discovered by Zych in 1989. The evidence presented consisted of the testimony of several expert witnesses and six pieces of correspondence pertaining to the ship which were recovered from CIGNA's archives. When questioned as to why CIGNA did not have additional documentation, Avery testified that it was Aetna's practice at that time to keep policy and claim information at the field office handling the particular claim. Avery believed it was quite likely that additional documents pertaining to the claim of the *Lady Elgin* had been retained at Aetna's Chicago office; however, that office had been completely destroyed in the Chicago Fire of 1871.

Each of the six letters retrieved were drafted in 1860, either by Aetna's vice-president, Thomas Alexander, or its president, E.G. Ripley. In the first letter, Alexander informed agents in Aetna's Chicago office, Hunt and Hubbard (also the ship's owner), that he had been notified of the loss and that Aetna "hope[d to] escape any claims on *** cargo." The second letter was from Alexander to Captain E.P. Dorr, an Aetna agent in Buffalo, New York, noting that the *Augusta* had "been libelled for $42,000" and inquiring whether this had been done at the instance of the owners of the *Lady Elgin*. The next letter, to an agent in Cincinnati, noted that policies covering the *Lady Elgin* were $5,000 for the hull and $2,500 for the cargo. In the subsequent letter, Ripley notified Hubbard and Hunt that Aetna wished to pay the claims on the ship as soon as they could be proved, and instructed the agents to prepare the claims and pay them. On October 10, 1860, Alexander again wrote to Hubbard and Hunt, stating, in relevant part:

"We regret that Mr. Hubbard declines to allow us the legal interest? [*sic*] off his claim because we should prefer to pay it at that rate—and because we think the circumstances would justify his concession of the legal interests in this case—however, we shall not discuss the point and permit the claim to layover until its maturity. *Permit us to confirm Capt. Dorr instructions not to accept an abandonment of the vessel, for the reason which he informs us he gave you on his recent visit to Chicago.*" (Emphasis added.)

The final letter of November 15, 1860, from Alexander to Hubbard and Hunt notes the payment of $11,993.20 "in full of policy on Lady Elgin."

### Evidence of Aetna's Initial Acquisition of Ownership

The *Lady Elgin* was a total loss, and Aetna's payment to Hubbard on the claim considerably exceeded that provided under the policy for the ship. After an insurer pays a claim on a total loss, it has the prerogative either to reject or accept "abandonment" of the remains of the insured vessel. An acceptance of abandonment means that the underwriter is vested with complete title to the wreckage including any rights or liabilities that may attach. The expert testimony of Ivan Avery and George Stellwag established that once the insurer pays on the loss, ownership of the wreckage passes automatically to that insurer, and it is unnecessary for the claimant to make an express tender of abandonment. Avery testified that in 1860, in the vast majority of cases of total loss, the practice of underwriters was to accept ownership of the insured wreckage. Avery further testified that he had "no question" that Aetna had accepted abandonment of the *Lady Elgin*. This opinion was partially based upon the notation in one of the letters that the *Augusta* had been "libelled for $42,000." According to Avery, this fact played a very important role in Aetna's decision to accept title, because it represented the amount that *Augusta* was likely going to have to pay in damages to the owners of the *Lady Elgin*. If Aetna ac-

cepted abandonment, it would obtain the right to these damages through subrogation.

The State called Victor Simone as a marine insurance expert. Simone testified that an insurance company's determination of whether to accept or reject abandonment is unrelated to its decision to pay a claim, because the latter decision merely turns upon whether the claim falls within coverage. Simone testified that it was common for insurance companies to refuse abandonment, and that he believed Aetna never acquired title to the *Lady Elgin* because (1) in response to a request to admit promulgated by the State, Aetna conceded that "on October 10, 1860," it had "not accepted" abandonment of the ship; (2) there was no evidence that Aetna acquired title; and (3) common sense dictated rejection of the wreckage because it would be difficult to salvage and had little salvage value. Addressing the statement in the letter of October 10, 1860, regarding Captain Dorr's instruction not to accept abandonment, Simone testified that this clearly showed that Aetna would not accept ownership of the vessel. Stellwag gave a contrary opinion, however, testifying that Captain Dorr's "instruction" was merely a recommendation, and that it was too early for a final decision by Aetna because the claim on the loss had not yet been paid.

### Evidence of CIGNA's Alleged Abandonment of Ownership

It was undisputed that neither Aetna nor CIGNA had attempted to salvage the *Lady Elgin* until Zych discovered the wreck and entered into the agreement with CIGNA. However, testimony of the parties' experts proved that until relatively recently, such efforts would have been extremely painstaking and economically impractical. The State's expert, Robert Kutzleb, described various methods available in 1860 by which the lake could be "dragged," and then, when an item was

"snagged," divers dispatched to retrieve it. Defense experts, however, dismissed this method as impractical in this case because the *Lady Elgin* had broken into many pieces and the bottom of Lake Michigan was replete with rocks and debris.

Defense expert Martin Klein testified that, as late as 1960, salvage technology was still "very rudimentary." Klein acknowledged that the sidescan sonar ultimately used to discover the ship was available in 1967; however, it was still in its infancy and very costly. In Klein's opinion, given the existent salvage and navigational technology, the chances of the *Lady Elgin* having been discovered prior to 1989 were "almost negligible." This was primarily because the wreckage was scattered and proved to be miles away from the location commonly reported. This was substantially corroborated by Zych, who also testified as a defense expert.

In ruling in favor of defendants, the trial court first rejected the State's contention that Aetna had refused abandonment, and concluded that the company had accepted title to the wreckage in 1860 when it paid the claim under the policy. The court then went on to find that the State had failed to prove that CIGNA subsequently abandoned its interest. The court was persuaded by the fact that CIGNA had preserved for 129 years the six pieces of correspondence evidencing its coverage of the ship, certain details of the claim, and its payment on the loss. The court further found that CIGNA's failure to search for the wreckage was justified by the fact that the necessary equipment to conduct such a search was unavailable until the 1970s.

On appeal, the court agreed with the trial court that Aetna had acquired title to the shipwreck in 1860; however, with one justice dissenting, the court reversed the determination that CIGNA had not subsequently abandoned its interest. The court accepted the State's

argument that, "as a matter of law, Aetna abandoned any interest when it made no effort to recover the wreckage, did not explore the possibility of recovering the wreckage, and displayed no interest in the ship for a period of 129 years." 292 Ill. App. 3d at 1094. The appellate court placed particular emphasis on CIGNA's failure to attempt to locate the shipwreck even after the technology to do so became available in the late 1960s or 1970s.

## ANALYSIS

The Act provides that states have management responsibilities over a broad range of resources, including "certain abandoned shipwrecks, which have been deserted and to which the owner has relinquished ownership rights with no retention." 43 U.S.C. §§ 2101(a), (b) (1994). Under the Act, a state is vested with title to any such shipwreck which is, in relevant part, (1) embedded in the submerged lands of that state; or (2) on the state's submerged lands and included in or determined eligible for inclusion in the National Register. 43 U.S.C.§§ 2105(a), (c) (1994). The Act itself does not define the term "abandoned"; however, the Supreme Court recently directed that the meaning of "abandoned" under the Act be determined in accordance with its meaning under admiralty law. *California v. Deep Sea Research, Inc.*, 523 U.S. 491, 508, 140 L. Ed. 2d 626, 640, 118 S. Ct. 1464, 1473 (1998).

We first consider the State's contention that Aetna never accepted title to the shipwreck in the first instance. The courts below concluded that Aetna had succeeded to ownership in 1860 when it paid insurance on the loss. In support of its argument that Aetna had rejected such ownership, the State again points to the evidence upon which it relied in the trial and appellate courts: (1) the letter of October 10, 1860, from Alexander to agents Hubbard and Hunt, noting Captain Dorr's "instructions not to accept an abandonment of the vessel"; and (2) the al-

leged concession by CIGNA in its response to the State's request to admit facts.

We disagree with the State's argument. First, it was undisputed that shortly after the October 10, 1860, letter was written, Aetna paid Hubbard $11,933.20 on the loss. The expert testimony showed that under established maritime law, title passes automatically to the insurer upon payment of the loss, unless the insurer affirmatively rejects such title. This principle is recognized in the regulations promulgated under the Act, which state:

> "When the owner of a sunken vessel is paid the full value of the vessel (such as receiving payment from an insurance underwriter) the shipwreck is not considered to be abandoned. In such cases, title to the wrecked vessel is passed to the party who paid the owner." 55 Fed. Reg. 50116, 50120-21 (1990).

See also *Deep Sea Research, Inc. v. Brother Jonathan*, 883 F. Supp. 1343, 1351 (N.D. Cal. 1995). We find no evidence that Aetna rejected such a passage of title. In fact, Avery testified that most insurers in Aetna's position did accept abandonment, and that he had no doubt that Aetna had done so in this case. As to Alexander's statement in the October 10 letter, we agree with the opinion of defense expert Stellwag that it appeared to reflect merely Captain Dorr's opinion or recommendation rather than any final decision by Aetna to reject abandonment.

The State also points to one of its requests to admit facts, which sought an admission that "Aetna refused or declined to accept abandonment of the Lady Elgin." CIGNA responded: "Admitted that *on October 10, 1860,* an abandonment of the Lady Elgin was *not accepted* by Aetna." (Emphasis added.) We agree with the appellate court that this statement does not mean that ownership was conclusively refused by Aetna or that it was not later accepted. This is especially so in light of CIGNA's response to a subsequent request to admit by the State, which provided that "[a]t no time did Aetna or CIGNA

accept an abandonment of the Lady Elgin," and to which CIGNA replied, "DENIED."

Defendants next argue that the appellate court invaded the province of the trier of fact when it reversed the determination that CIGNA had not abandoned its interest in the ship. In response, the State argues that Aetna and CIGNA's "complete disinterest" in the ship for 129 years, and, in particular, CIGNA's failure to undertake salvage efforts after technology made it possible in the 1970s, requires a conclusion that CIGNA had abandoned its interest.

In general, a finding of abandonment is considered a factual determination (*Nunley v. M/V Dauntless Colocotronis*, 863 F.2d 1190, 1198 (5th Cir. 1989); *Friedman v. United States*, 347 F.2d 697, 704 (8th Cir. 1965)), which this court will not disturb unless it is against the manifest weight of the evidence (*In re Application of the County Treasurer*, 131 Ill. 2d 541, 549 (1989)). Where there are different ways to view the evidence, or alternative inferences to be drawn from it, we accept the view of the trier of fact as long as it is reasonable. See *Application of the County Treasurer*, 131 Ill. 2d at 549; *Commercial Mortgage & Finance Co. v. Life Savings of America*, 129 Ill. 2d 42, 49 (1989); see also *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 84 L. Ed. 2d 518, 528, 105 S. Ct. 1504, 1511 (1985). It is irrelevant whether we may have reached a different result were we the trier of fact; it is not the function of this or any other reviewing court to reweigh evidence.

As the Act fails to define abandonment, we look for guidance to the regulations promulgated under the Act and the definition of the term under admiralty law. The regulations define "abandoned shipwreck" as "any shipwreck to which title voluntarily has been given up by the owner with the intent of *never claiming a right or interest in the future* and without vesting ownership in

any other person." (Emphasis added.) 55 Fed. Reg. 50116, 50120 (1990). This definition generally comports with long-recognized maritime law which characterizes abandonment as the act of leaving or deserting property without the hope of ever recovering it or the intention of returning to it. 3A Benedict on Admiralty § 134 (7th ed. 1980); *Zych v. Unidentified, Wrecked & Abandoned Vessel, Believed to be the SB "Lady Elgin,"* 755 F. Supp. 213, 214 (N.D. Ill. 1991). In order to prove abandonment, a party must show (1) an intent to abandon, and (2) acts carrying that intent into effect. *Zych,* 755 F. Supp. at 214. As always, the burden of proving an abandonment lies with the party who relies on it. See generally *Brunotte v. DeWitt,* 360 Ill. 518, 533 (1935); *Burns v. Curran,* 275 Ill. 448 (1916). It is incumbent upon that party to prove, by strong, convincing and unequivocal evidence, that the owner freely intended to relinquish ownership. *Zych,* 755 F. Supp. at 214; see also *Columbus-America Discovery Group v. Atlantic Mutual Insurance Co.,* 974 F.2d 450, 461 (4th Cir. 1992); see generally *Brunotte,* 360 Ill. at 533; *People v. Dorney,* 17 Ill. App. 3d 785, 787-88 (1974).

Generally, admiralty law is reluctant to find a repudiation of ownership. Title to articles lost at sea remains in the owner, and a salvor does not gain ownership merely by finding the property. 3A Benedict on Admiralty § 150, at 11—1 through 11—2 (7th ed. 1980), citing *The Akaba,* 54 F. 197 (4th Cir. 1893). With these principles in mind, courts have recognized that when articles are lost at sea, "lapse of time and nonuser are not sufficient, in and of themselves, to constitute an abandonment." See *Columbus-America,* 974 F.2d at 461, quoting *Wiggins v. 1100 Tons, More or Less, of Italian Marble,* 186 F. Supp. 452, 456 (E.D. Va. 1960) (requires proof of a "clear and unmistakable affirmative act" indicating purpose to repudiate ownership).

Nonetheless, it is well established that abandonment can be either express or implied, and may, and often must, be determined based upon circumstantial evidence of intent. *Moyer v. Wrecked & Abandoned Vessel Known As the Andrea Doria*, 836 F. Supp. 1099, 1105 (D.N.J. 1993), citing *Wiggins v. 1100 Tons, More or Less, of Italian Marble*, 186 F. Supp. 452, 456 (E.D. Va. 1960); see also *Zych*, 755 F. Supp. at 214. Lapse of time and nonuse may give rise to an inference of abandonment, particularly when coupled with a failure to come forward in an action to claim ownership rights (*Bemis v. RMS Lusitania*, 884 F. Supp. 1042, 1049 (E.D. Va. 1995), citing *Columbus-America*, 974 F.2d at 461) or a disinterest in pursuing salvage efforts (see, *e.g., Moyer*, 836 F. Supp. at 1105). However, in light of the strong policy against abandonment, an owner is not required to undertake a search for the vessel where the lack of technology would make the search infeasible or futile. *Moyer*, 836 F. Supp. at 1105, citing *Zych*, 755 F. Supp. at 216; *Deep Sea Research, Inc. v. Brother Jonathan*, 102 F.3d 379, 388 (9th Cir. 1996), *vacated on other grounds*, 143 F.3d 1299 (9th Cir. 1998).

In this case, the appellate court's reversal was based upon its conclusion that, as a matter of law, CIGNA had shown complete disinterest in the ship even after technology existed to find the vessel. Although that court cast its decision as reduced to a question of law, we believe it was, instead, an improper reevaluation of disputed facts.

First, the trial court found it significant that for over a century, Aetna and CIGNA had preserved the six letters which evidenced Aetna's coverage and ultimate ownership of the *Lady Elgin*. The appellate court dismissed this fact by saying that the rationale for such continued preservation "cannot be known for certain" (292 Ill. App. 3d at 1098); however, experts Avery and Stellwag indicated that this manifested the insurers'

interest in the ship. Avery further indicated that there most likely had been additional documentation concerning the *Lady Elgin* stored in CIGNA's Chicago office, but that this office was completely destroyed in the Chicago Fire. This was appreciable evidence of an intent not to abandon, and the appellate court erred in disregarding it.

Second, the appellate court focused upon CIGNA's failure to search for the ship. Expert testimony showed nearly conclusively, however, that efforts to locate the wreckage prior to the 1970s would have been highly impractical to virtually impossible. CIGNA was not required to embark upon an impracticable salvage excursion in order to escape a finding of abandonment. Indeed, defense expert Klein gave the opinion that, even in the 1970s, the sidescan sonar was "still in its infancy," and that in light of the existent salvage and navigational technology, and the broken condition of the wreckage, any efforts to locate the ship prior to 1989 would have proved "almost negligible." Under the facts of this case, a failure to pursue salvage efforts did not equate to a "complete disinterest" in the ship. It is significant that as soon as CIGNA learned of Zych's discovery of the shipwreck, it immediately entered into an agreement with the Foundation and then came forward to assert its rights in court. Such circumstances have been held persuasive proof of an intent not to abandon. *Cf., Columbus-America*, 974 F.2d at 462; *Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked & Abandoned Steam Vessel*, 833 F.2d 1059, 1065 (1st Cir. 1987). This is consistent with the Act's regulations, which state that abandonment requires an intent of "never claiming a right or interest in the future." The evidence sufficiently showed that CIGNA lacked any intent to relinquish its rights. Accordingly, the appellate court erred in substituting its judgment for that of the trial court.

The State and *amici* assert that the trial court ap-

plied an improper legal standard in considering whether CIGNA abandoned its interest in the *Lady Elgin*; specifically, they maintain that the court required proof that CIGNA have made an *express renunciation* of ownership, rather than accepting circumstantial evidence of abandonment. The requirement of "express renunciation" was supposedly imposed by the Fourth Circuit's holding in *Columbus-America* (see 974 F.2d at 472 (Widener, J., dissenting)), and was specifically rejected by the court in *Fairport International Exploration, Inc. v. Shipwrecked Vessel Known As The Captain Lawrence*, 105 F.3d 1078 (6th Cir. 1997), *vacated & remanded on other grounds*, 523 U.S. 1091, 140 L. Ed. 2d 790, 118 S. Ct. 1558 (1998); see also *Brother Jonathan*, 102 F.3d at 388.

We note in passing that the Supreme Court denied *certiorari* in the *Columbus-America* case. However, even assuming, without deciding, that the *Columbus-America* case was wrongly decided, this does not require reversal of the trial court in this case. We are not convinced that the trial court here applied the wrong standard, because it specifically observed that abandonment could be proved by inference. In any event, we need not accept the trial court's legal conclusion, as long as its factual determinations are supported by the record. As stated above, the relevant findings were amply supported in this case. Thus, there is no basis for any finding of error.

In light of our result, we do not reach defendants' remaining contentions.

## CONCLUSION

For the foregoing reasons, the appellate court's decision is reversed, and the judgment of the circuit court is affirmed.

> *Appellate court judgment reversed;*
> *circuit court judgment affirmed.*